United States Court of Appeals,

Eleventh Circuit.

No. 94-2330.

UNITED STATES of America, Plaintiff-Appellee,

v.

Charles A. EIDSON, Sandra A. Eidson, Defendants-Appellants.

March 31, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 92-00094-CR-T-25(A), Lee P. Gagliardi, Visiting Judge.

Before ANDERSON, Circuit Judge, and KRAVITCH and HENDERSON, Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

The Clean Water Act ("CWA" or "the Act") prohibits the addition of any pollutant into navigable waters from any point source. 33 U.S.C. §§ 1311(a), 1362(12). It defines "navigable waters" to mean "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The primary issue before this court is whether the drainage ditch into which appellants' company discharged industrial wastewater was a "navigable water" within the meaning of § 1362(7).

## I. Background

Cherokee Trading Partners, Inc. ("Cherokee") was a Delaware corporation with its principal place of business at 5118 Ingraham Street in Tampa, Florida.[1] Charles Eidson was the president of Cherokee and his wife, Sandra Eidson, was its secretary and

[1]From 1985 until 1989, the Eidsons were corporate officers of Cherokee Oil Co. Ltd. When this company was dissolved in 1989, Cherokee Trading Partners took over its operations. Both companies will be referred to in this opinion as "Cherokee."

registered agent.  Cherokee operated a used oil recycling and wastewater disposal business.  The company collected used oil from businesses for free or for a small fee, brought the oil back to its facility, reduced the water content if necessary, and then resold the oil to other businesses.  For a slightly higher fee, Cherokee collected and agreed to dispose properly of industrial wastewater.

On April 25, 1990, a Tampa police officer observed a Cherokee truck parked at the intersection of Ingraham and O'Brien Streets, approximately 100 yards from the company's facility.  The officer noticed a "sludge substance" being pumped from the truck into a storm sewer that drained into a storm drainage ditch connecting Ingraham and Commerce Streets.  At the time of discharge, a light flow in the storm drainage ditch continued northward into a nearby drainage canal that ran east-west along Commerce Street and that eventually emptied into Tampa Bay.

While the officer was observing the scene, Sandra Eidson approached him.  She stated that she was vice-president of Cherokee and that she had told the driver of the truck to pump the substance into the storm sewer.  She further informed the officer that the liquid had come from an underground fuel tank in a gasoline station and had been used to rinse the tank to eliminate any residual gasses,[2] but that Cherokee had permission to pump into the sewer.  When questioned by an environmental inspector later that day, Charles Eidson stated that he had given Sandra Eidson permission to have the driver dump the contents of the truck into the sewer.

---

[2]Subsequent laboratory tests revealed that the substance pumped from the truck into the sewer contained a number of priority pollutants.

The unauthorized discharge of pollutants on April 25, 1990 was hardly an isolated incident at the Cherokee site. Upon the instruction of Charles and Sandra Eidson, Cherokee employees routinely discharged industrial wastewater from trucks onto the ground at the Cherokee site or into the woods and bushes of an adjacent lot. Cherokee employees also went to great lengths to conceal these discharges from environmental regulators. In company documents, they inventoried wastewater that had been discharged onto the ground in a fictional "Tank 8." In anticipation for one announced environmental inspection, Cherokee employees imported truckloads of dirt to hide the site's gross soil contamination. At the same time that it was discharging industrial wastewater in violation of its operating permits and governing environmental laws, Cherokee was routinely assuring its customers that it was treating and disposing of contaminated wastewater in accordance with all applicable environmental laws, regulations, and permits.

Charles and Sandra Eidson were indicted and charged with one count of violating the CWA, 33 U.S.C. §§ 1311(a), 1319(c), by knowingly discharging or causing the discharge of pollutants into navigable waters of the United States. They were also charged with three counts of violating the mail fraud statute, 18 U.S.C. § 1341, by devising and implementing a scheme to defraud in which they used false representations to solicit business customers for Cherokee's wastewater disposal business.[3] Following conviction by a jury on all counts, Charles and Sandra Eidson were sentenced to 70 and 37

[3]The three separate counts of mail fraud stem from the mailing of invoices for the disposal of wastewater to three different companies in August and September 1990.

months, respectively.  This appeal followed.

Concluding that the drainage ditch connecting Ingraham and Commerce Streets is a "navigable water" under the CWA and rejecting appellants' other challenges, we AFFIRM their convictions.  Finding an insufficient factual basis for two of the sentence enhancements imposed by the district court, we VACATE their sentences and REMAND for resentencing.

## II. Discussion

*A. Count I:  Clean Water Act*

With respect to their CWA convictions, appellants claim that the district court erred in denying their motions for judgment of acquittal made pursuant to Fed.R.Crim.P. 29(a).  Most significantly, they claim that the government provided insufficient evidence to prove that the storm drainage ditch connecting Ingraham and Commerce Streets was a "navigable water" within the meaning of § 1362(7) of the CWA.[4] We consider appellants' legal claim *de novo,* reviewing the evidence in the light most favorable to the government.  *United States v. Mejia,* 97 F.3d 1391, 1392 (11th Cir.1996).

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's

---

[4]Appellants also assert that there was insufficient evidence to prove that they were responsible for the discharges and that the discharged substance was a pollutant.  These claims are without merit.  Witnesses testified that both defendants admitted responsibility for the discharge of the substance into the storm sewer.  In addition, the "sludge substance" discharged from the Cherokee truck, which had been used to remove gasses from an underground storage tank at a gasoline station, tested positive for numerous substances classified as pollutants by the Environmental Protection Agency ("EPA").

waters."  33 U.S.C. § 1251.  In order to implement this daunting mandate, Congress "chose to define the waters covered by the Act broadly."  *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 133, 106 S. Ct. 455, 462, 88 L.Ed.2d 419 (1985).  Courts have agreed that Congress intended the definition of navigable waters under the Act "to reach to the full extent permissible under the Constitution."  *See United States v. Lambert,* 695 F.2d 536, 538 (11th Cir.1983).

The CWA defines "navigable waters" as "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  This broad definition "makes it clear that the term "navigable' as used in the Act is of limited import" and that with the CWA Congress chose to regulate waters that would not be deemed navigable under the classical understanding of that term. *Riverside Bayview Homes,* 474 U.S. at 133, 106 S.Ct. at 462; *see also United States v. Ashland Oil and Transportation Co.,* 504 F.2d 1317, 1325 (6th Cir.1974) (holding that non-navigable tributary of navigable river is a "navigable water" under § 1362(7)). Therefore, we can easily dispose of appellants' contention that the drainage ditch was not a "navigable water" solely because it was not navigable-in-fact.[5]

It is by now well established that Congress intended to regulate the discharge of pollutants into all waters that may eventually lead to waters affecting interstate commerce.  In

---

[5]Appellants' reliance on *Lykes Brothers, Inc. v. United States Army Corps of Engineers,* 821 F.Supp. 1457 (M.D.Fla.1993), *aff'd,* 64 F.3d 630 (11th Cir.1995), is misplaced.  That case dealt with a provision of the Rivers and Harbors Act, 33 U.S.C. § 403, which is inapplicable here.

adopting the present definition of "navigable waters," Congress recognized that "[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source. Therefore, reference to the control requirements must be made to the navigable waters, portions thereof, and their tributaries." S.Rep. No. 92-414, at 77 (1972), *reprinted in,* 1972 U.S.C.C.A.N. 3668, 3742-43. In accordance with this legislative intent, EPA has defined "waters of the United States" to include tributaries to waters that "may be susceptible to use in interstate or foreign commerce," 40 C.F.R. § 230.3(s),[6] and courts repeatedly have

[6]40 C.F.R. § 230.3(s) provides:

The term "waters of the United States" means:

   (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

   (2) All interstate waters including interstate wetlands;

   (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

       (i) Which are used or could be used by interstate or foreign travelers for recreational or other purposes; or

       (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

       (iii) Which are or could be used for industrial purposes by industries in interstate commerce;

   (4) All impoundments of waters otherwise defined as waters of the United States under this definition.

   (5) Tributaries of waters identified in paragraphs (1)

recognized that tributaries to bodies of water that affect interstate commerce are "waters of the United States" protected by the CWA. *See, e.g., United States v. Texas Pipe Line Co.,* 611 F.2d 345, 347 (10th Cir.1979) (tributary to navigable river); *Ashland Oil,* 504 F.2d at 1324 (tributary that eventually flowed into river that was navigable-in-fact); *State of Georgia v. City of East Ridge,* 949 F.Supp. 1571, 1578 (N.D.Ga.1996) (unnamed tributary of interstate creek); *United States v. Saint Bernard Parish,* 589 F.Supp. 617, 620 (E.D.La.1984) (canal flowing into wetland).

There is no reason to suspect that Congress intended to regulate only the natural tributaries of navigable waters. Pollutants are equally harmful to this country's water quality whether they travel along man-made or natural routes. The fact that bodies of water are "man-made makes no difference.... That the defendants used them to convey the pollutants without a permit is the matter of importance." *United States v. Holland,* 373 F.Supp. 665, 673 (M.D.Fla.1974); *see also Leslie Salt Co. v. United States,* 896 F.2d 354, 358 (9th Cir.1990) (noting that protection of the CWA "does not depend on the how the property at issue became a water of the United States"), *cert. denied,* 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1194 (1991). Consequently, courts have acknowledged that ditches and canals, as well as streams and creeks, can be "waters of the United States" under § 1362(7). *See, e.g., United States v. Velsicol Chemical Corp.,* 438 F.Supp. 945, 947 (W.D.Tenn.1976) (sewers that lead to Mississippi River); *Holland,* 373 F.Supp. at 673 (mosquito canals that empty

through (4) of this section;  ...

into bayou arm of Tampa Bay).

Likewise, there is no reason to suspect that Congress intended to exclude from "waters of the United States" tributaries that flow only intermittently. Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage.[7] As the Tenth Circuit noted in *Texas Pipe Line,* "[i]t makes no difference that a stream was or was not at the time of the spill discharging water continuously into a river navigable in the traditional sense." 611 F.2d at 347. Rather, as long as the tributary would flow into the navigable body of water "during significant rainfall," it is capable of spreading environmental damage and is thus a "water of the United States" under the Act. *Id.; see also Quivira Mining Co. v. United States Environmental Protection Agency,* 765 F.2d 126, 130 (10th Cir.1985) (upholding regulation because "during times of intense rainfall, there can be a surface connection" between tributary and navigable-in-fact streams), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *United States v. Phelps Dodge Corp.,* 391 F.Supp. 1181, 1187 (D.Ariz.1975) ("waters of the United States" include "normally dry arroyos" from which water could flow to public waters).

With these principles in mind, we turn to the evidence presented in this case concerning the drainage ditch between Ingraham and Commerce Streets. As Cherokee was discharging pollutants into the storm sewer system on April 25, 1990, a light

_____

[7]As the court noted in *Ashland Oil,* the government need not prove that the pollutant actually reached the navigable body of water. 504 F.2d at 1329.

flow was traveling from the sewer drain into the open drainage ditch that connected Ingraham and Commerce Streets. The flow continued northward in this ditch until it reached Commerce Street, where it passed underneath the street and into a drainage canal that ran parallel to Commerce Street. The sewer, the ditch, and the canal were all part of a storm drainage system that was designed to discharge storm water into Tampa Bay. During heavy rainfall and during high tide,[8] water flows from the drainage ditch connecting Ingraham and Commerce Streets into the Commerce Street drainage canal, which empties into Picnic Island Creek, a tributary to Tampa Bay.

We hold that this evidence is sufficient to establish that the drainage ditch into which Cherokee discharged its pollutants is a tributary of Tampa Bay and is thus a "water of the United States" under § 1362(7). To hold otherwise and to allow polluters to contaminate this drainage system would defeat the intent of Congress and would jeopardize the health of our nation's waters.

Appellants also contend, without any supporting case law, that the CWA's definition of pollutant is unconstitutionally vague because it does not provide someone discharging petroleum-based products with fair notice that this behavior is prohibited. A statute is not unconstitutionally vague as long as it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

---

[8]At high tide, water reached approximately the half-way point of the ditch between Commerce and Ingraham Streets.

*Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). We review the CWA's definition of pollutant in light of the particular facts of this case. *See United States v. Waymer,* 55 F.3d 564, 568 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996) (noting that vagueness challenges that do not involve the First Amendment are examined in light of facts before the court).

Section 1362(6) defines pollutant as:

dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

Although this definition of pollutant is broad, it is not unduly vague. The liquid discharged by the Cherokee truck had been used as a cleaning agent for an underground storage tank at a gas station and was described as having a strong petroleum odor and a dirty, oily appearance. Given these facts, we do not hesitate to conclude that an ordinary person should have been able to understand that the petroleum-based, sludge-like substance was industrial waste within the meaning of the Act. Because the statute provided the Eidsons with adequate notice that their conduct was prohibited, we reject appellants' constitutional challenge.[9]

*B. Counts II-IV:  Mail Fraud*

---

[9]Appellants also contend that the Act is unduly vague because it does not specify what content level of petroleum would make a discharged liquid a pollutant. The CWA prohibits "the discharge of *any* pollutant." 33 U.S.C. § 1311(a) (emphasis added). Again, we find the Act broad rather than vague. Considering the sludge-like qualities of the liquid discharged by Cherokee, appellants cannot reasonably contend that the statute did not provide them with adequate notice that the discharge was prohibited.

Appellants also contend that there was insufficient evidence to support their convictions for mail fraud. In order to prove a violation of 18 U.S.C. § 1341, the government must establish that appellants: (1) intentionally participated in a scheme to defraud or to obtain money by fraudulent pretenses and representations; and (2) used the United States mails to further that scheme. *United States v. Wingate,* 997 F.2d 1429, 1433 (11th Cir.1993). Appellants argue that the government failed to establish a fraudulent scheme because there was no evidence that they made false representations to their customers. Based on a thorough review of the record, we find ample evidence to support appellants' mail fraud convictions.

A scheme to offer services in exchange for a fee, with the intent not to perform those services, constitutes a fraudulent scheme under § 1341. *United States v. Paccione,* 949 F.2d 1183, 1196 (2d Cir.1991), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992). Upon instructions from Charles and Sandra Eidson, Cherokee representatives regularly informed prospective customers that Cherokee had proper licenses and permits to dispose of wastewater. Cherokee documents displayed permit numbers and Cherokee contracted to dispose of wastewater in accordance with all applicable laws, codes, and regulations. Despite these representations, Charles and Sandra Eidson instructed Cherokee employees to dump the collected industrial wastewater on the ground at and around the Cherokee facility in direct violation of their operating permits and applicable environmental laws and regulations. We hold that this evidence is sufficient to support

appellants' mail fraud convictions.[10]

*C. Sentencing Issues*

Appellants also raise a number of claims regarding their respective sentences. We review the factual findings of a district court at sentencing for clear error, and review its interpretation of the Sentencing Guidelines *de novo.* *United States v. Holland,*22 F.3d 1040, 1045 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 898, 130 L.Ed.2d 782 (1995).

With respect to their count one convictions, appellants first challenge the district court's decision to increase their offense levels pursuant to U.S.S.G. § 2Q1.2(b)(1)(A)(1993). That section provides for a six-level increase if the "offense resulted in an ongoing, continuous or repetitive discharge." Appellants contend that there was only one discharge into waters of the United States. However, Sandra Eidson admitted that there had been another discharge into the sewer approximately one week before the April 25, 1990 discharge. We find that this admission is sufficient to support an offense-level increase under § 2Q1.2(b)(1)(A). *See United States v. Catucci,* 55 F.3d 15, 18 (1st Cir.1995) (holding that two discharges on separate days sufficient to support increase § 2Q1.2(b)(1)(A)); *United States v. Strandquist,* 993 F.2d 395, 401

---

[10]Appellants also contend that the government violated Fed.R.Crim.P. 16(c) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not furnishing them with copies of documents that agents seized from Cherokee's office when they executed a search warrant in March 1992. Appellants have presented no evidence to support these claims. In a letter dated September 17, 1992, the prosecutor informed appellants that they could pick up the seized documents that the government did not plan to use at trial. Although informed of their availability, neither appellant made any attempt to retrieve or review the seized documents before trial.

(4th Cir.1993) (two separate incidents sufficient to support upward adjustment under analogous provision of § 2Q1.3(b)(1)(A)).

Appellants also contend that the district court erred in imposing an offense-level increase pursuant to U.S.S.G. § 2Q1.2(b)(3)(1993). Section 2Q1.2(b)(3) provides for a four-point increase if "cleanup required a substantial expenditure." Application Note 7 states that this section governs cases where "cleanup at substantial expense has been required." U.S.S.G. § 2Q1.2 comment. (n. 7). Appellants argue that because both the guideline and the application note refer to cleanups in the past tense, the district court erred in basing the upward adjustment on an estimate of future cleanup costs.

Section 2Q1.2(b)(3) makes a defendant's sentence dependant on the nature of contamination caused by the environmental offense. The costs of cleanup are but one method a court can use to measure the seriousness of contamination. Section 2Q1.2(b)(3) also provides for an offense-level increase if the discharge resulted in "disruption of public utilities or evacuation of a community." We find it unlikely that Congress intended that a defendant guilty of serious environmental contamination should receive a lesser sentence merely because the conviction occurred before the appropriate environmental agency could undo the harm. Such a reading would thwart Congress's intent to punish defendants according to the level of environmental degradation caused by their criminal offenses.

Moreover, in this case, the Florida Department of Environmental Regulation already had incurred significant cleanup

costs at the time of sentencing. It had conducted a preliminary site survey and liquid sample retrieval of Cherokee's site, which indicated that Cherokee's illegal discharge had caused gross contamination of the surficial sediments and the surficial aquifer. The costs incurred for this preliminary examination, which exceeded thirty thousand dollars, are properly considered cleanup costs. *See United States v. Bogas,* 920 F.2d 363, 369 (6th Cir.1990) (holding that cleanup expenditures under § 2Q1.2(b)(3) include site testing, studies, and other indirect costs of site remediation).

Based on its preliminary investigation, the department concluded that complete cleanup of the Cherokee site would cost several hundred thousand dollars. Because this estimate was based on a thorough preliminary examination of the site, we are satisfied that it represents an accurate and reliable measure of the degree of contamination caused by appellants' discharges. We also conclude that the contamination in this case was quite serious. Accordingly, we hold that the preliminary investigation and cleanup estimate provide an adequate basis for an upward adjustment under § 2Q1.2(b)(3). *See Bogas,* 920 F.2d at 369 (noting that the government need not provide an exact accounting of cleanup costs in order to demonstrate "substantial expenditure" under this section); *United States v. Paccione,* 751 F.Supp. 368, 376 (S.D.N.Y.1990) (estimate of future cleanup costs is sufficient to support § 2Q1.2(b)(3) increase), *aff'd on other grounds,* 949 F.2d 1183 (2d Cir.1991), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).

Charles Eidson also contends that the district court erred in

imposing an offense-level increase under U.S.S.G. § 3B1.1(a)(1993) for his role as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."[11] The district court increased Eidson's offense level by four points for his role in the CWA violation and for his role in the mail fraud scheme because it found that Cherokee employed an average of five or more persons. Eidson claims that the district court erred because there was insufficient evidence to conclude that these employees were participants in the illegal discharge and fraudulent scheme.

In determining the number of participants in a criminal activity, courts count all individuals, including the defendants, who were criminally responsible for the commission of the offense even though they might not have been convicted. *United States v. Holland,* 22 F.3d 1040, 1045 (11th Cir.1994), *cert. denied, ---* U.S. ----, 115 S.Ct. 898, 130 L.Ed.2d 782 (1995); U.S.S.G. § 3B1.1 comment. (n. 1). With respect to the mail fraud counts, there is ample evidence to support the district court's finding. Appellants regularly instructed Cherokee employees to dump the wastewater on the ground and to refer fraudulently to the ground as "Tank 8". They also instructed employees to inform prospective customers that Cherokee had all the necessary permits and licenses. Two Cherokee employees testified that they knowingly participated in the fraudulent scheme and also referred to other drivers and a yard foreman who participated in the scheme to defraud Cherokee

---

[11]Sandra Eidson did not receive an upward adjustment under this section.

customers.  Based on this record, we conclude that the district court did not clearly err in increasing Eidson's offense level for his mail fraud convictions.

The district court's upward adjustment for the CWA conviction presents a more difficult question.  As we noted in *United States v. Rodgers,* a sentencing court cannot enhance an offense level merely because a defendant "acted with others for the other charges against him."  951 F.2d 1220, 1221 (11th Cir.)(citing *United States v. Tetzlaff,* 896 F.2d 1071, 1074 (7th Cir.1990)), *modified in part,* 972 F.2d 1253 (11th Cir.1992).  In other words, a court should only consider "conduct immediately concerning" the offense of conviction in determining an adjustment under § 3B1.1(a).  *See Holland,* 22 F.3d at 1046 n. 10.[12] For purposes of the offense-level increase for the CWA conviction, we will not consider the number of participants involved in the mail fraud scheme because those discharges did not "immediately concern" the CWA offense.

Both appellants and the driver of the Cherokee truck can be classified as participants in the April 25 discharge.  There is no

---

[12]*Rodgers* apparently was based on the pre-November 1990 version of § 3B1.1 that did not include the introductory commentary directing courts to consider relevant conduct pursuant to § 1B1.3 in determining a defendant's role in the offense. Nevertheless, its holding appears to continue to govern cases dealing with the post-amendment version of § 3B1.1. *See Holland,* 22 F.3d at 1046 n. 10 (applying 1991 version and distinguishing *Rodgers* ). In the event that the November 1990 amendment somehow altered the law of this circuit in such a way that would increase Eidson's punishment, it would not apply because Eidson committed this offense before the commentary became effective. *See United States v. Wilson,* 993 F.2d 214, 216 (11th Cir.1993) ("We apply the version of the sentencing guidelines and commentary in effect on the date of sentencing, unless a more lenient punishment would result under the guidelines version in effect on the date the offense was committed.") (citations omitted).

factual basis in the record, however, to identify other participants in this particular offense. None of the former Cherokee employees who testified at trial were employed at the time of this illegal discharge and none of them testified about other discharges into "waters of the United States." Although a bookkeeper presumably prepared a manifest and invoice for this delivery, there is no reason to believe that he or she was aware that the pollutant was dumped into a "water of the United States" rather than onto the Cherokee lot with most of the other pollutants. Therefore, we conclude that there was insufficient evidence in the record to conclude that the illegal discharge of a pollutant into "waters of the United States" involved five or more participants.

Section 3B1.1 allows for an offense-level increase, however, on the alternative ground that the criminal activity was "otherwise extensive." Although the presentence report, adopted by the district court, did not specify that it found the criminal activity "otherwise extensive," we examine the record to determine if such a finding would have been justified.

Neither the Guidelines nor the cases interpreting § 3B1.1 provide a precise definition of "otherwise extensive." Such a finding depends on a number of factors including "the length and scope of the criminal activity as well as the number of persons involved." *Holland,* 22 F.3d at 1046 (noting that criminal activity that extended over three years and involved the assistance of several individuals raised a question as to whether it was "otherwise extensive"); *see also United States v. Rodriguez,* 981

F.2d 1199, 1200 (11th Cir.) (finding drug operation that extended from Colombia to New York and involved 100 kilos of cocaine "otherwise extensive"), *cert. denied,* 508 U.S. 955, 113 S.Ct. 2455, 124 L.Ed.2d 671 (1993).[13]

The district court made no such factual findings in this case. The record indicates only that one other similar discharge into a "water of the United States" occurred a week before the April 25 discharge. We conclude that this evidence is insufficient to establish that the criminal activity involved in the CWA conviction was "otherwise extensive."

Finally, appellants challenge the district court's factual finding that the loss caused by their fraudulent scheme exceeded two hundred thousand dollars. Based on this finding, the district court increased their offense levels by eight points pursuant to U.S.S.G. § 2F1.1(b)(1)(I)(1993). Again, the district court merely adopted the factual findings contained in the presentence report and made no specific factual findings to support the upward adjustment.[14]

The presentence report, without any underlying factual support, concluded that Cherokee had fraudulently billed Mobil Oil, Diamond Products Company, and the B & E Equipment Company

---

[13] "In assessing whether an organization is "otherwise extensive,' all persons involved during the entire course of the offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 comment. (n. 3).

[14] The transcript for Sandra Eidson's sentencing hearing is not part of this record on appeal. Nevertheless, the order of judgment indicates that the district court adopted the presentence report's factual findings.

$215,427.22 for services that were not rendered.  Apparently, the presentence report incorrectly interpreted a government chart, entitled "Waste Water Transactions of Cherokee Oil, Inc.1985-1991," which valued Cherokee's total wastewater revenues at $215,427.22.[15] Although losses incurred by other Cherokee customers are includable in a § 2F1.1 calculation, there must be some factual basis for the conclusion that these losses were the result of fraud.  *See* U.S.S.G. § 2F1.1 comment. (n. 7) (1993) ("[L]oss is the value of money, property, or services *unlawfully* taken.") (emphasis added).

Former Cherokee employees testified that Cherokee regularly billed customers for wastewater disposal that it did not conduct from May 1990 to November 1991.  There was no factual basis in the record, however, to conclude that the wastewater disposal practices of Cherokee from 1986 to May 1990 were equally fraudulent.  The only witness to testify about Cherokee's practices before 1990, Albert Martell, worked with the company for only four months in 1986 and specifically disavowed any knowledge as to how wastewater pickups were disposed.[16]  Based on this record, we conclude that the district court committed clear error in concluding that the fraudulent scheme caused over two hundred thousand dollars in

---

[15]This chart was offered as evidence at trial by the government, but was rejected by the district court on relevancy grounds.  Its exclusion at trial does not, however, preclude its use at sentencing.  *See* U.S.S.G. § 6A1.3 (1991) (noting that at sentencing district court may consider reliable information without regard to its admissibility at trial).

[16]Martell did indicate that in his four months as bookkeeper he never came across any bills that Cherokee paid for proper disposal of wastewater.  However, this fact standing alone cannot support the inclusion of all gross wastewater revenues from 1986-1990.

losses.[17]

### III. Conclusion

We AFFIRM appellants' convictions, VACATE their sentences, and REMAND the case to the district court for resentencing.

---

[17]The government argues that this deficiency in proof can be remedied by contemplating the costs that the defrauded companies may incur if they are required to contribute to cleanup costs pursuant to Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607. The presentence report, however, does not reference the potential liability of former Cherokee customers. In the event such liability could be properly considered under this section, we conclude that at present it is too speculative to support an enhancement.