**F I L E D**
United States Court of Appeals
Tenth Circuit

NOV 13 1997

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

   Plaintiff-Appellee,

v.                                                            No. 96-3029

VAN RAY YARNELL,

   Defendant-Appellant.

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 95-CR-20028-2-DES)**

Scott C. Gyllenborg, Norton, Hubbard, Ruzicka & Kreamer, Olathe, KS, argued
the cause for the appellant.

Robert S. Streepy, Assistant United States Attorney, Kansas City, KS, argued the
cause for the appellee. Jackie N. Williams, United States Attorney, Kansas City,
KS, assisted on the brief.

Before **EBEL, LOGAN,** and **KELLY**, Circuit Judges.

**EBEL**, Circuit Judge.

   Defendant-Appellant Van Ray Yarnell, through his wholly-owned company

Five Star Towing, recruited drivers to drive tow trucks. The drivers were

required to pay Five Star Towing about $4,000 each as down payments on their tow truck leases. Thirty-six recruited drivers paid their money to Five Star Towing, but received neither tow trucks nor refunds. Five Star Towing then went bankrupt. A jury convicted Yarnell of two counts of mail fraud, although it acquitted him on five other counts.

At sentencing, the district court enhanced Yarnell's sentence based on the total losses to forty drivers who paid down payments to Five Star Towing, even though Yarnell had been acquitted of defrauding some of these drivers and had not been charged with defrauding most of the rest. The district court also enhanced Yarnell's sentence because Yarnell was the leader of a criminal activity in which five or more people were involved.

Yarnell now appeals both his conviction and his sentence. We affirm.

## BACKGROUND

This is an appeal from a judgment of criminal conviction entered pursuant to a jury verdict. Thus, the following statement of facts presents all disputed evidence, and all reasonable inferences to be drawn from the evidence, in the light most favorable to the government. See United States v. Meacham, 115 F.3d 1488, 1495 (10th Cir. 1997).

In June or July 1990, defendant-appellant Van Ray Yarnell started Five Star Towing, an automobile towing company located in the Kansas City, Kansas area.

Yarnell appointed himself president of Five Star Towing, and appointed his partner John Dawes vice-president. Soon, Yarnell and Dawes began recruiting tow-truck drivers to work in Kansas City and in Denver. Five Star Towing towed its first cars in Kansas City on October 16, 1990.

Drivers for Five Star Towing were required to lease their own trucks. To facilitate this process, Five Star Towing would help the drivers secure lease financing. Usually, a driver would have to make a down payment of about $4,000 to obtain lease financing. The driver would generally tender this down payment to Five Star Towing, which would assume the responsibility to forward the money to a leasing company and arrange for the delivery of the tow-truck to the driver.[1] Some drivers were told that by leasing a truck and paying this downpayment to Five Star Towing, they were also purchasing their own Five Star Towing franchise. At least fifty-five drivers paid money to Five Star Towing. Thirty-six of these drivers never received a truck or restitution. No driver ever received a franchise.

From the beginning, Five Star Towing suffered financial difficulties. In late 1990, Five Star Towing mailed checks for its first set of tow truck lease payments to its primary leasing company, Bush & Cook. The checks bounced.

---

[1]In exchange for the referral, the leasing company would pay Five Star Towing a brokerage fee for each truck lease.

Five Star Towing had withheld revenues from its drivers' gross receipts to make these lease payments. Because of the bounced checks to Bush & Cook, some trucks were never delivered to drivers who had made their down payments to Five Star Towing, and some trucks were repossessed.

In December 1990, Five Star Towing entered into an agreement with Leaseline, another truck leasing company, through which fourteen Five Star Towing drivers received tow trucks. Although the first payment due to Leaseline was paid in full, subsequent checks to Leaseline bounced. Five Star Towing's relationship with Leaseline was therefore terminated in March 1991, and the trucks were then repossessed by Leaseline.

In January 1991, Yarnell made a $5,000 or $10,000 down payment towards the purchase of a $600,000 home located on a golf course in Deer Creek, an exclusive suburban Kansas City neighborhood. He agreed to make mortgage payments of $5,000 per month to the owner, and moved into the house in late January.[2] Subsequently, a few payments on the house were made out of Five Star Towing's payroll account. At the same time, however, paychecks to Five Star Towing's employees began to bounce. Including both his salary and the payments on the Deer Creek house, Yarnell drew a total of about $35,000 in personal

---

[2]Yarnell claimed at trial that he intended to use the house for Five Star Towing's business purposes. However, the government presented evidence that such a use would have violated the rules of the Deer Creek home association.

- 4 -

expenses from the Five Star Towing payroll account during the company's seven-month existence.

In 1991, Yarnell (personally and through his subordinates) sought to raise capital for Five Star Towing by holding recruiting presentations in other cities, including Atlanta, Phoenix, and St. Louis. At these presentations, additional drivers were recruited. Most of these drivers paid about $4000 each to Five Star Towing for down payments on their tow trucks, although one driver claimed to have paid $10,000, and another claimed to have paid $15,000 to Five Star Towing.[3]

Some drivers recruited in Atlanta, Phoenix, and St. Louis were offered the opportunity to purchase a Five Star Towing "franchise." Some of these drivers were presented with a written "franchising agreement" or a circular represented to be a franchise agreement which disclosed that "[t]he proceeds from the original franchise fee are in part profit to Five Star Towing and are deposited into the general working capital fund of Five Star Towing and will be used in part to pay some . . . costs and expenses of Five Star Towing." No driver ever actually received a Five Star Towing franchise in exchange for any "original franchise fee" paid to Five Star Towing.

---

[3]The jury acquitted Yarnell on the counts pertaining to the drivers who claimed to have made $10,000 and $15,000 down payments.

After remitting their down payments to Five Star Towing, many drivers recruited in Atlanta, Phoenix, and St. Louis received letters falsely telling them that trucks had been ordered for them. No driver recruited in Atlanta or Phoenix ever received a truck. Only a few drivers located in St. Louis ever received trucks.

In March 1991, Five Star Towing's Vice President John Dawes left the company. In May, 1991, all of Five Star Towing's drivers quit *en masse*. At that time, several of the drivers, with the assistance of Five Star Towing's bookkeeper Shelly Haeberle, entered Yarnell's office and emptied it out, removing all of the books, records, furniture, and other items to a storage facility.

In March 1995, Yarnell and John Dawes were indicted by a federal grand jury on seven counts stemming from the activities of Five Star Towing. The indictment did not (and the government does not) contend that Five Star Towing was started with fraudulent intent. Rather, the government's theory was that Five Star Towing was started as a legitimate towing business, but that after it developed financial problems, it defrauded drivers and other investors by telling them that their money would be used for specific purposes such as making down payments on trucks or obtaining a franchise, while actually intending to use the money for other purposes including payroll, operating expenses, and repaying loans, as well as Yarnell's and Dawes's personal expenses.

Dawes pled guilty to one of the counts of mail fraud (Count 3), and agreed to testify against Yarnell. Yarnell proceeded to trial, over which the district court exercised jurisdiction pursuant to 18 U.S.C. § 3231 (1994). In October, 1995, after deliberating for three days, and after initially informing the trial judge that they were unable to reach a verdict on some of the counts, a jury acquitted Yarnell on five counts in the seven-count indictment, and convicted him of two counts (Counts 2 and 3) alleging violations of 18 U.S.C.A. § 1341 (West Supp. 1997) (mail fraud).

Specifically, the jury convicted Yarnell of using the mail to defraud Charlie Parsons and Donald Voss out of $3500 and $4000, respectively. Charlie Parsons was an elderly driver recruited in Atlanta who, in February 1991, tendered a $3500 down payment to Five Star Towing for a truck lease, but never received the truck. At trial, Yarnell admitted that he considered Parsons too old to drive a Five Star Towing truck, although he did not know how old Parsons was when he sent in his money. Donald Voss was a driver recruited in St. Louis who, in January 1991, tendered a $4000 down payment to Five Star Towing for a truck lease and franchise rights, but never received either the truck or the franchise.[4] Both Parsons and Voss tendered their down payments to Five Star Towing by

---

[4]In April, 1991, Donald Voss received a refund of $500 from Five Star Towing, after complaining about not receiving his truck.

sending checks to Five Star Towing through the U.S. Mail. Although the jury convicted Yarnell of using the mails to defraud Parsons and Voss out of a total of $7500, it acquitted Yarnell of all the other charges against him.

After denying Yarnell's Motion For Judgment of Acquittal or New Trial, the district court sentenced Yarnell to 30 months in prison on each of the two counts, sentences to run concurrently.[5] In computing this sentence, the court enhanced Yarnell's sentence for all of the conduct alleged in Yarnell's indictment, including the conduct for which Yarnell was acquitted by the jury. The court also enhanced Yarnell's sentence significantly for conduct not alleged in Yarnell's indictment. Finally, the court enhanced Yarnell's sentence for being the leader of a criminal enterprise consisting of five or more persons.[6] The 1994 edition of the U.S. Sentencing Guidelines Manual was used to compute Yarnell's sentence.

Yarnell now appeals. He claims that: (1) the evidence was insufficient to support his conviction; (2) a mistrial should have been declared when the jury informed the judge that it was deadlocked on some of the counts; and (3) the

---

[5] The court also sentenced Yarnell to 3 years of supervised release following the prison term, and ordered Yarnell to pay restitution in the amount of $3500 to Charlie Parsons and $4000 to Donald Voss.

[6] The district court also enhanced Yarnell's sentence by 2 points pursuant to U.S.S.G. § 2F1.1(b)(2)(A), because Yarnell's offense involved "more than minimal planning." This is the only enhancement which Yarnell does not appeal.

sentencing enhancers applied by the district court were erroneous. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291 (1994).

## DISCUSSION

### I. Insufficiency of the Evidence

We review *de novo* the district court's conclusion that the evidence was sufficient to support Yarnell's conviction. United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.), cert. denied, 117 S. Ct. 226 (1996). However, Yarnell's burden to succeed on this claim is high. Id. Like the district court, we ask only whether the direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom, all taken in the light most favorable to the government, would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt. Id.

In the present case, Yarnell was convicted of two counts of mail fraud pursuant to 18 U.S.C. § 1341, which provides that:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office . . . or takes or receives therefrom any such matter or thing . . . shall be fined under this title or imprisoned not more than five years, or both.

Yarnell does not (and cannot) dispute that the government presented evidence tending to establish that Charlie Parsons and Donald Voss mailed checks

for $3500 and $4000, respectively, to Five Star Towing; that Five Star Towing, at Yarnell's direction, told both Parsons and Voss that this money was for down payments on tow trucks, and told Voss that this money would also go towards the purchase of franchise rights; that Five Star Towing cashed the checks; and that neither Parsons nor Voss ever received anything in exchange for their money (although Voss received a partial refund of $500).

Rather, Yarnell disputes that the government presented evidence tending to establish Yarnell's *intent* to defraud.  Specifically, Yarnell claims that evidence demonstrating that Five Star Towing *disclosed* to Parsons and Voss that their deposits might be used to cover Five Star Towing's general operating expenses was presented and was not controverted.  Yarnell argues that this allegedly uncontroverted evidence tends to negate any reasonable inference of fraudulent intent.

"To prove a violation of the mail fraud statute, the government must prove three things: (1) the devising of a scheme or artifice either (a) to defraud or (b) for obtaining money by means of false or fraudulent pretenses, representations, or promises, (2) *the specific intent to defraud*, and (3) the use of the United States mails to execute the scheme." United States v. Kennedy, 64 F.3d 1465, 1475 (10th Cir. 1995) (emphasis added).  Without a stringently enforced specific intent

to defraud requirement, the proprietor of any bankrupt business might be criminally at risk under 18 U.S.C. § 1341 (Supp. 1997).

After examining the record, we cannot agree that the government failed to present sufficient evidence for a reasonable jury to find fraudulent intent beyond a reasonable doubt. Although a jury could reasonably have acquitted Yarnell based on the evidence presented, the record contains several evidentiary bases upon which Yarnell's conviction may be sustained.

In support of his claim that evidence tending to negate an inference of fraudulent intent was presented at trial and not controverted by the government, Yarnell cites language from pages 13 and 14 of a written draft "franchising agreement" which was presented to some drivers recruited in Atlanta, Phoenix, and St. Louis. The draft "franchising agreement" disclosed to potential "franchisees" that:

> The proceeds from the initial franchise fee are in part profit to Five Star Towing and are deposited into the general working capital fund of Five Star Towing and will be used in part to pay some of the following costs and expenses of Five Star Towing: . . . Supervision and assistance provided by Five Star, research and development of the Five Star Towing operations manual, legal fees, accounting fees in compliance with federal, state and other laws, employees' salaries and fringe benefits, selling, general and administrative expenses, research and development and costs of obtaining and screening franchisees.

This evidence provides an insufficient basis for overturning Yarnell's conviction, for several reasons. First, this disclaimer applies only to funds

tendered to Five Star Towing as an "original franchise fee." There is no evidence in the record indicating that Five Star Towing ever disclosed to any driver that money tendered to Five Star Towing *for a down payment on a tow truck lease* might be deposited into the general working capital fund of Five Star Towing, or used for any purpose other than as a down payment on a tow truck lease. Yarnell was convicted of fraudulently inducing drivers Charlie Parsons and Donald Voss to tender money to Five Star Towing by convincing Parsons and Voss that the money would be earmarked for down payments on tow truck leases.[7] Further, the majority of the "related conduct" for which Yarnell's sentence was enhanced pertained to fraudulent solicitation of funds which were purportedly to be used for down payments on tow truck leases. Indeed, every individual recruited by Five Star Towing, either as a driver or as a "franchisee," had to put money down for a down payment on a tow truck lease. Yarnell's disclaimer, even if effective, simply did not apply to such funds. The record contains no evidence showing that Five Star Towing ever disclosed to Parsons, Voss, or any other driver, that their tow truck down payment money might be diverted for other purposes. Yarnell's disclaimer applied only to funds tendered to Five Star Towing as an "original franchise fee."

---

[7]Donald Voss was told that half of his $4,000 would be earmarked for a down payment on a tow truck lease, and the other half would be applied towards the purchase of Five Star Towing franchise rights.

In any event, the government presented evidence that Five Star Towing's policy of selling illusory "franchises" was itself conceived with fraudulent intent. Five Star Towing Vice President John Dawes testified that Yarnell decided to sell "franchises" to drivers being recruited in Atlanta shortly after being told by franchise attorney Don Culp that it would be illegal for Five Star Towing to do so. Dawes further testified that, at Yarnell's direction, Dawes personally represented to prospective recruits in Atlanta that they were buying Five Star Towing franchises, while knowing that his representations were untrue. Dawes identified a written franchise "offering circular" that he distributed, at Yarnell's direction, in Atlanta, which purported to set forth the terms and conditions governing a Five Star Towing franchise agreement. However, no driver who tendered funds to Five Star Towing in reliance on the "offering circular" or on Dawes's oral representations ever received a Five Star Towing franchise.

Alternatively, in the present case, the jury could have found that Five Star Towing formally made the disclaimers to which Yarnell testified, but intended such disclaimers to be ineffective. Yarnell's victims, Parsons and Voss, were unemployed people seeking to become tow truck drivers. The jury could have inferred that Parsons and Voss were unsophisticated in business matters and that the sales presentation was intended to, and did, cause them either not to focus on such disclaimers or to disregard or misunderstand them.

In support of this conclusion, Voss testified that Five Star Towing told him that "if I paid my $4,000 and they're going to--two thousand will go for a franchise and two thousand for a truck." Parsons testified that his understanding was that the entirety of the $3500 he paid to Five Star Towing was for a "down payment for a tow truck." The evidence of the ineffectiveness of the written disclaimer, combined with the evidence suggesting that representatives of Five Star Towing had made oral assurances which contradicted the disclaimer, may give rise to an inference that Yarnell intended for Parsons and Voss not to understand the significance of the disclaimers.

Finally, the government presented evidence that funds collected from prospective tow truck drivers for lease down payments and franchise fee payments were diverted to pay Yarnell's *personal* expenses, including expensive rent payments on Yarnell's suburban luxury residence. Yarnell does not claim that he disclosed to truck drivers that any of their payments to Five Star Towing might be used to pay Yarnell's personal expenses. Therefore, the jury could have found that Yarnell defrauded Parsons and Voss to the extent that he then diverted their payments to cover such expenses.

In sum, the record contained evidence sufficient to support the jury's verdict under any of several theories of the case. Thus, we must reject Yarnell's

claim that the evidence presented was legally insufficient to support his conviction.

## II. Jury Misconduct

Following closing arguments, and after deliberating for three days, the jury sent a note informing the district court that "it appears we are deadlocked, and at the time we cannot seem to agree." The court then read the letter to counsel for the government and for Yarnell, and asked them for comments or suggestions. At this juncture, the government requested that the jury be brought into the courtroom and asked whether further deliberations would be of any assistance. Counsel for Yarnell responded to the government's suggestion by saying:

> Judge, I know we inserted an instruction to kind of educate them on this kind of process, and they have the value of that instruction, and I don't have any other comment. It appears that they've been working hard. If they're at an impasse, we're just going to have to deal with it, I guess.

The judge then recalled the jury into the courtroom, and said:

> Members of the jury, I have your note here that says that it appears that you are deadlocked and cannot agree . . . . Do I take it that you have not--I don't want to know any numbers or anything like that. You have not agreed on any of the counts? Mr. Foreperson, is that correct?

Mr. Foreperson answered in the negative, and informed the court that the jury members all agreed on at least one of the counts, although the vote on the other counts had changed in two different directions and had changed every time

a vote was taken. Outside the presence of the jury, the judge suggested to counsel for both parties that the jury should be sent back to determine whether it was in agreement on any of the counts, and to report which counts it had agreed upon and which counts it could not agree upon. Counsel for both parties indicated that they agreed with this course of action.

The court then gave the jury the following instruction:

Members of the jury, I'm going to ask you to do one thing, and that is to return into deliberation and determine whether or not and how many of the counts you're agreed upon and how many you're not so that this can be reported back in court--in open court like this. I don't want a message to that effect. I want you all to be here when we get that report. Would you please withdraw and establish for us which counts, if any, you've agreed upon and which you have not. I don't want to know the vote on the ones that you have not, nor do I necessarily want to know the decision on the ones you have, but I just want to know if you've agreed on any and those you do not and give us a report of that. Would you do that?

Neither party objected to this instruction.

After a recess, the jury returned with a final verdict. Yarnell did not object in any way to the rendering of a verdict at that time. Subsequently, after being convicted on two of the seven counts, Yarnell filed a motion for a new trial. Even in this motion, however, which challenged the sufficiency of the evidence underlying Yarnell's conviction, Yarnell raised no issue regarding the circumstances under which the court accepted the jury's verdict. Now, for the first time, Yarnell claims that it was improper for the court to accept the jury's

verdict after the jury informed the court that it had been deadlocked on some of the counts.

As a general rule, this court will not consider an issue on appeal that was not raised below, except to correct the most manifest error. Sac & Fox Nation v. Hanson, 47 F.3d 1061, 1063 (10th Cir.), cert. denied, 116 S. Ct. 57 (1995); compare Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1228-29 (10th Cir. 1996). Far from representing "the most manifest error," the district court's conduct in the present case was entirely proper, and Yarnell's argument to the contrary borders on the frivolous.

As the above-quoted instruction makes clear, the district court never instructed the jurors to cease their deliberations, nor did Yarnell object below to the procedure that was followed. Yarnell's claim that the jury disobeyed the court's instructions is meritless. Consequently, we decline to consider this claimed error on appeal.

### III. Sentencing Issues

In addition to challenging his conviction, Yarnell also challenges his sentence. Specifically, in this regard, Yarnell claims that the district court erred both in its application of the "total loss" sentencing enhancer, U.S.S.G. § 2F1.1(b)(1), and in its application of the "leader or organizer" sentencing enhancer, U.S.S.G. § 3B1.1(a). We consider each of these arguments in turn. In

- 17 -

reviewing a sentence, we "give due regard to the opportunity of the district court to judge the credibility of the witnesses, . . . accept the findings of fact of the district court unless clearly erroneous, and . . . give due deference to the district court's application of the guidelines to the facts."  18 U.S.C. § 3742(e) (1994).

## A.

Under U.S.S.G. § 2F1.1(a) (1994), the "base offense level" for a defendant convicted of a charge involving "fraud and deceit" is six.  This base offense level generally must be enhanced to reflect the total amount of financial loss to the defendant's victims.  U.S.S.G. § 2F1.1(b)(1); see generally United States v. Rice, 52 F.3d 843, 848 (10th Cir. 1995) (describing the procedure under U.S.S.G. § 2F1.1(b)(1) for enhancing a sentence based on the amount of the victim's loss), aff'd after remand, 76 F.3d 394 (10th Cir.) (table), cert. denied, 116 S. Ct. 2536 (1996).  Yarnell was convicted of defrauding Charlie Parsons and Donald Voss out of $3500 and $4000, respectively.  Based on this conduct alone, Yarnell's base offense level must be enhanced by two sentencing points pursuant to U.S.S.G. § 2F1.1(b)(1)(C).

Relying on the government's presentence report, however, the district court found that Yarnell had also engaged in other acts that were part of the same course of conduct or common scheme or plan as the frauds against Parsons and Voss.  Specifically, the district court adopted the presentence report's conclusion

that Five Star Towing had accepted down payment money from 55 prospective tow truck drivers, and that 36 to 40 of those drivers received nothing of value from Five Star Towing in return. The presentence report computed the total loss to the 40 drivers to be $159,750. Accordingly, pursuant to U.S.S.G. § 2F1.1(b)(1)(H), the district court enhanced Yarnell's base offense level by seven points (from six to thirteen).

Yarnell concedes that under U.S.S.G. § 1B1.3(a)(2), a sentence may be enhanced for "relevant conduct" of which the defendant has not been convicted. However, he claims that the district court erred in the present case by including in its "total loss" computation the gross losses rather than the net losses of Yarnell's victims, and by including losses attributable to conduct allegedly not "relevant" to the conduct for which Yarnell was convicted. In addition, Yarnell claims that the government did not establish by a preponderance of the evidence that Yarnell caused losses to the alleged victims with respect to whom Yarnell was acquitted.

For sentencing purposes, "[w]e review a district court's determination of a U.S.S.G. § 2F1.1 loss under the clearly erroneous standard, but the factors a district court properly may consider are reviewed *de novo*." United States v. Fox, 999 F.2d 483, 485 (10th Cir. 1993) (quoting United States v. Gallegos, 975 F.2d 710, 712 (10th Cir.1992), appeal after remand, 39 F.3d 276 (10th Cir. 1994)). The relevance of conduct for which Yarnell was not charged or of which he was

acquitted is a question of law which we review *de novo*. Id. Whether Yarnell

actually engaged in such conduct is a question of fact, reviewed under the "clearly

erroneous" standard. See Fox, 999 F.2d at 485.

With respect to sentence enhancements and reductions, "[t]he government

shall bear the burden of proof for sentence increases and the defendant shall bear

the burden of proof for sentence decreases. This rule requires neither party to

prove the negative of a proposition." Rice, 52 F.3d at 848 (quoting United States

v. Kirk, 894 F.2d 1162, 1164 (10th Cir.1990)). An enhancement under U.S.S.G.

§ 2F1.1(b)(1) "is a sentencing increase within the meaning of Kirk, so the

government bears the burden of proof." Id.

Section 1B1.3(a)(2) of the Sentencing Guidelines provides that the offense

level for "offenses of a character for which U.S.S.G. § 3D1.2(d) would require

grouping of multiple counts"[8] shall be determined on the basis of "all acts and

omissions ... that were part of the same course of conduct or common scheme or

plan as the offense of conviction." In assessing the amount of loss under

U.S.S.G. § 2F1.1(b)(1), "[t]he district court is not necessarily limited to the funds

identified with the crime charged in the indictment, or which resulted in a

---

[8]Mail fraud is an offense for which U.S.S.G. § 3D1.2(d) would require
grouping of multiple counts. See U.S.S.G. § 3D1.2(d) (stating that grouping of
multiple counts is required for all offenses covered by U.S.S.G. § 2F1.1).
Accordingly, U.S.S.G. § 1B1.3(a)(2) is applicable.

judgment of guilty." United States v. Kunzman, 54 F.3d 1522, 1532 (10th Cir. 1995) (citing United States v. Johnson, 971 F.2d 562, 576 n.10 (10th Cir. 1992)); accord United States v. Kelly, 1 F.3d 1137, 1139 n.1 (10th Cir. 1993) ("The Tenth Circuit allows a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."), aff'd after remand, 28 F.3d 114 (10th Cir. 1994) (table).

Thus, the district court was entitled to consider all of Yarnell's conduct in his capacity as president of Five Star Towing pertaining to the solicitation of down payments from tow truck drivers, including such conduct for which Yarnell was acquitted or was not indicted. Remaining at issue is whether the district court committed clear error in accepting the presentence report's account of that conduct as relevant and true.

We agree with Yarnell that, in certain respects, the presentence report inflated the magnitude of his victims' losses. In fact, our review of this presentence report has revealed a number of instances of apparent inconsistency, carelessness, and ambiguity. For example, in three instances, the presentence report's computation included down payments obtained from drivers who *did* in fact receive their tow trucks from Five Star Towing although they were later repossessed. (Presentence Report at 10 ¶ 2, 11 ¶ 10, 12 ¶ 11). In three instances, the amount of an individual's loss used in the presentence report's total loss

computation inexplicably overstated the amount stated in the report's presentation of the facts. Compare id. at 10 ¶ 2 with id. at 17 (Hedgpeth); id. at 14 ¶ 10 with id. at 17 (Barthelman); id. at 14 ¶ 11 with id. at 17 (Boisvert). In several instances, it inexplicably changes the surnames of Five Star Towing's victims. Compare id. at 11 ¶ 6 with id. at 17 (Weingart); id. at 13 ¶ 2 with id. at 17 (Farrow); id. at 12 ¶ 3 with id. at 17 (Alstyne). The total loss of $159,750 which Five Star Towing is alleged to have caused its drivers is erroneously calculated, although the error favors Yarnell by $2500. See id. at 17. Finally, the presentence report contains no indication of the basis of its information concerning the identities and loss amounts of the 55 tow truck drivers whose dealings with Five Star Towing it describes. See id. at 8-17. Yarnell was charged with defrauding only 7 of the 55 drivers discussed in the presentence report, and no evidence appears to have been presented at trial or at the sentencing hearing regarding Five Star Towing's dealings with the remaining 48 drivers.

"We repeatedly have held that a district court may not satisfy its obligation by simply adopting the presentence report as its finding." United States v. Farnsworth, 92 F.3d 1001, 1011 (10th Cir.) (citing cases), cert. denied, 117 S. Ct. 596 (1996). Nonetheless, the district court did not commit clear error in calculating the loss of relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(2).

Consistent with Rule 32(b)(6)(D), "[w]e have repeatedly held that if a defendant fails to object to his presentence report, he waives his right to challenge the district court's reliance on it, unless the district court's decision to do so amounts to plain error." United States v. Ivy, 83 F.3d 1266, 1297 (10th Cir.), cert. denied, 117 S. Ct. 253 (1996) (citing United States v. Saucedo, 950 F.2d 1508, 1518 (10th Cir. 1991), overruled in other respects, Stinson v. United States, 508 U.S. 36 (1993)). In Saucedo, we held that "[a] factual dispute concerning the applicability of a particular guideline, not brought to the attention of the district court, does not rise to the level of plain error." 950 F.2d at 1518.

Here, prior to the present appeal, Yarnell never challenged the factual accuracy of the presentence report's account of the forty drivers who paid money to Five Star Towing and never received trucks. Rather, prior to the present appeal, Yarnell's objections to the presentence report focussed entirely on the fact that Yarnell had not been convicted by the jury of defrauding any of these drivers except for Parsons and Voss. Yarnell's legal theory was erroneous in this regard, and because he did not pursue his present factual theory, he has therefore now forfeited it.[9]

_____

[9]In addition, we note that the resolution of all the Presentence Report's internal inconsistencies in Yarnell's favor would have reduced the "total loss" from $159,750 to $146,300. Because the seven point "total loss" enhancement received by Yarnell applies to all "total losses" between $120,000 and $200,000, U.S.S.G. § 2F1.1(b)(1)(H) (1994), any errors attributable to these inconsistencies

B.

Finally, Yarnell claims that his sentence was improperly enhanced under U.S.S.G. § 3B1.1(A) for two reasons: (1) Yarnell was not the "organizer or leader" of Five Star Towing's operations because John Dawes participated in all important decisions; and (2) Yarnell's criminal activity did not involve five or more participants and was not otherwise extensive.

With respect to whether Yarnell was the "organizer or leader" of Five Star Towing's criminal operations, the standard of review appears to be in dispute. Compare United States v. Albers, 93 F.3d 1469, 1486-87 (10th Cir. 1996) ("a challenge to the conclusion reached that one is a supervisor as defined in [U.S.S.G. § 3B1.1] is primarily legal, and the trial court's determination on it is reviewed under a *de novo* standard") (quoting United States v. Brown, 995 F.2d 1493, 1501 (10th Cir. 1993)) with United States v. Owens, 70 F.3d 1118, 1127 (10th Cir. 1995) (the district court's finding that a defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive within the meaning of U.S.S.G. § 3B1.1(a) is reviewed only for clear error, giving due deference to the district court's application of the guidelines to the facts) (citing United States v. Torres, 53 F.3d 1129, 1142 (10th Cir.1995), cert. denied, 115 S. Ct. 2599 (1995)).

---

would not have affected Yarnell's sentence.

- 24 -

Under either a *de novo* or a "clearly erroneous" standard, however, we would affirm the district court's conclusion that Yarnell was the "organizer or leader" of Five Star Towing's legal and illegal operations. Yarnell was the founder of Five Star Towing and had the title of "president." Dawes, from the outset, had the title of "vice president." Further, Dawes left Five Star Towing in March 1991, halfway through its four-month active life span, while Yarnell continued to run the company until the bitter end. There can be no serious dispute that Yarnell was the "organizer or leader" of Five Star Towing.

Yarnell also claims that the government did not prove that Five Star Towing's criminal activity involved five or more participants or was otherwise extensive.[10] Under U.S.S.G. § 3B1.1, an "organizer, leader, manager, or supervisor" of a criminal enterprise receives only a two-point enhancement if the enterprise was small, U.S.S.G. § 3B1.1(c), but receives a four-point enhancement if the enterprise "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The district court's finding that Yarnell's criminal activity involved five or more participants or, in the alternative, that the operation was otherwise extensive is a finding of fact which is reviewed under the "clearly erroneous" standard. See United States v. Lacey, 86 F.3d 956, 967 (10th Cir.),

---

[10]Unlike his pretrial response to the presentence report's "total loss" computation, Yarnell clearly and properly objected to the presentence report's characterization of his criminal activity as involving five or more participants or being otherwise extensive.

cert. denied, 117 S. Ct. 331 (1996); United States v. Cordoba, 71 F.3d 1543, 1547 (10th Cir. 1995).

Although we doubt that the record can support the district court's finding that the enterprise involved five or more participants, there is no doubt that the record does support the district court's finding that the enterprise was "extensive." "Neither the Guidelines nor the cases interpreting § 3B1.1 provide a precise definition of 'otherwise extensive.'" United States v. Eidson, 108 F.3d 1336, 1346 (11th Cir.), cert. denied, 118 S. Ct. 248 (1997). However, the application note to § 3B1.1 states, "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1(a), comment. (n. 2) (1994). As a result, even where the activity involves less than five participants, § 3B1.1(a) still applies if the defendant plays a leadership or organizing role in criminal activity that is "otherwise extensive." See United States v. Reid, 911 F.2d 1456, 1465 (10th Cir. 1990).

We agree with the First Circuit's interpretation of the phrase "otherwise extensive" as set forth in United States v. Dietz:

> [T]he sentencing court is free to consider the use of unwitting outsiders in determining if a criminal enterprise is "extensive" within the contemplation of section 3B1.1 . . . . The extensiveness of a criminal activity is not necessarily a function of the precise number of persons, criminally culpable

> or otherwise, engaged in the activity. Rather, an inquiring court must examine the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.

950 F.2d 50, 53 (1st Cir. 1991). In <u>Reid</u>, this court upheld a § 3B1.1(a) enhancement for a defendant who led a drug conspiracy that involved less than five participants but that supplied hundreds of customers over a three-week period. <u>Id.</u> Other circuits similarly have affirmed sentence enhancements under § 3B1.1(a) for extensive conduct involving less than five criminally culpable participants. <u>See, e.g.</u> <u>United States v. Patasnik</u>, 89 F.3d 63, 69 (2nd Cir. 1996) (upholding finding that two-man fraudulent operation affecting numerous victims over two years qualified as "otherwise extensive" activity); <u>United States v. Briscoe</u>, 65 F.3d 576, 590 (7th Cir. 1995) (fraudulent loan operation run by three criminally culpable parties over four years and involving 59 fraudulent transactions totalling $120,000 constituted an "otherwise extensive" enterprise); <u>United States v. Mullins</u>, 992 F.2d 1472, 1479 (9th Cir. 1993) (fraudulent acquisition of frequent flyer miles valued at $1.3 million by three persons was "otherwise extensive" activity); <u>United States v. Rodriguez</u>, 981 F.2d 1199, 1200 (11th Cir. 1993) (drug operation that extended from Columbia to New York and involved 100 kilograms of cocaine found to be "otherwise extensive"); <u>Dietz</u>, 950 F.2d at 53 (filing of fraudulent social security and unemployment claims by defendant and three others in seven states over twelve years and involving several

governmental agencies and elaborate planning constituted "otherwise extensive" conduct).

The fraudulent enterprise in this case spread from Denver to Phoenix, St. Louis and Atlanta. It lasted four months, created at least 40 victims, and generated losses in excess of $140,000. Yarnell's enterprise involved considerable planning and complex execution, and included at least one other culpable participant as well as a number of other participants who may not have been culpable.[11]

Thus, we cannot say the district court was clearly erroneous in finding that this enterprise was extensive.

## CONCLUSION

The district court's judgment convicting Van Ray Yarnell on two counts of violating 18 U.S.C. § 1341 and sentence is AFFIRMED.

---

[11] Because the activity in this case involved at least two criminally culpable participants, we need not address the question of whether a criminal operation that involves only one criminally responsible party may be considered "otherwise extensive" under § 3B1.1. Similarly, because more than five participants were involved overall, although not all were criminally culpable, we need not consider whether a criminal enterprise must involve a combination of at least five culpable and non-culpable participants to qualify as an "otherwise extensive" activity.