UPPER CHATTAHOOCHEE RIVER-KEEPER FUND, INC., The Chattahoochee Riverkeeper, Inc., W. Robert Hancock, Jr., Troup County; The City of West Point; The City of LaGrange; The LaGrange–Troup County Chamber of Commerce; Heard County; The City of Hogansville; Harris County; and The Lake Harding Association, Plaintiffs,

v.

THE CITY OF ATLANTA, Defendant.

No. CIV.A. 1:95–CV–2550–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 17, 1997.

David H. Pope, Carr Tabb & Pope, Atlanta, GA, for Upper Chattahoochee, Troup County, Lake Harding Assoc., LaGrange–Troup, Heard County, Harris County, W. Robert Hancock, Jr., City of West Point, City of LaGrange, City of Hogansville, Jack Baytos.

Susan Barker Forsling, Susan M. Hartwig, Vernitia Averett Shannon, Office of Fulton County Atty., Atlanta, GA, for Fulton County.

Newton G. Quantz, Richard Allen Horder, Kilpatrick Stockton, Atlanta, GA, for City of Atlanta.

## *ORDER*

THRASH, District Judge.

### *I. STATEMENT OF FACTS*

#### *A. THE PARTIES*

##### 1.

The Upper Chattahoochee Riverkeeper Fund, Inc. is a membership organization devoted to the protection and preservation of the Chattahoochee River system from the headwaters to West Point Lake. Its members currently use and enjoy the Chattahoochee River system for a variety of recreational, esthetic, economic, and other purposes. The Upper Chattahoochee Riverkeeper Fund, Inc. brought this action on behalf of its members.

##### 2.

The Chattahoochee Riverkeeper, Inc. is a defacto membership organization devoted to the protection and preservation of the Chattahoochee River system from the headwaters to Apalachicola Bay. Its members currently use and enjoy the Chattahoochee River system from north of Atlanta to south of Columbus for a variety of recreational, esthetic, economic, and other purposes. The Chattahoochee Riverkeeper, Inc. brought this action on behalf of its members.

##### 3.

Robert W. Hancock, Jr. is the owner of a 300–acre tract of land on the West Bank of the Chattahoochee River in Heard County. Mr. Hancock's property lies approximately 70 miles downstream of Atlanta at a point where the Chattahoochee River fails to meet its designated use classification.

##### 4.

Troup County is a political subdivision of the State of Georgia. West Point Lake is in Troup County. Troup County brought this action on behalf of itself and its citizens.

##### 5.

The City of West Point is a municipal corporation in Troup County. The city is near the southern end of West Point Lake where the Chattahoochee exits the lake. The City of West Point brought this action on behalf of itself and its citizens.

##### 6.

The City of LaGrange is a municipal corporation in Troup County. The city is near West Point Lake. West Point Lake supplies drinking water for the city. The City of LaGrange brought this action on behalf of itself and its citizens.

##### 7.

The City of Hogansville is a municipal corporation in Troup County. The city is to the northeast of West Point Lake. The City

of Hogansville brought this action on behalf of itself and its citizens.

8.

The LaGrange–Troup County Chamber of Commerce is a membership organization whose mission is to promote economic development and cultural and civic events within LaGrange and Troup County. The main focus of the Chamber of Commerce is economic and tourism development.

9.

Heard County is a political subdivision of the State of Georgia. The Chattahoochee River runs through the county, and the northern end of West Point Lake is in the county. Heard County brought this action on behalf of itself and its citizens.

10.

Harris County is a political subdivision of the State of Georgia. Part of the City of West Point is within Harris County. Citizens of Harris County live and/or own property on the Chattahoochee River. Harris County brought this action on behalf of itself and its citizens.

11.

The Lake Harding Association is an association of residents and homeowners on Lake Harding dedicated to preserving the environment of Lake Harding. Lake Harding is partially in Harris County. The Chattahoochee River, downstream of West Point Lake, supplies Lake Harding. The Lake Harding Association brought this action on behalf of itself and its members.

## B. *THE SEWAGE TREATMENT SYSTEM GENERALLY*

12.

Atlanta owns and operates a sewage treatment system that includes a system of sewer pipes and several water pollution control plants. It receives domestic sewage, industrial sewage and stormwater runoff from within the City of Atlanta and from other governmental entities outside the City of Atlanta including Fulton County and DeKalb County. It is partially a combined sewer (i.e., it receives domestic sewage, industrial sewage, and storm water runoff together

rather than through separate pipes). Approximately 21 square miles of the Atlanta sewer system is a combined sewer. This system of pipes transports the sewage and stormwater runoff to Atlanta's water pollution control plants. Treated effluent is then discharged from the water pollution control plants into either the Chattahoochee River, the Oconee River or their tributaries.

13.

Because Atlanta is situated on a ridge, the treatment system is divided into two parts—east and west. The east side discharges into the Oconee River. The west side discharges into the Chattahoochee River. The entire west side of the Atlanta sewer system is approximately 203 square miles in area. This lawsuit only involves the west side of the treatment system.

## C. *THE COMBINED SEWER OVERFLOWS*

14.

Atlanta has five combined sewer overflow [CSO] areas.

15.

Atlanta's underground sewer pipes are designed to carry the necessary amounts of sewage and storm water during normal conditions. During significant rainfall events, large amounts of storm water runoff may cause these underground pipes to exceed their capacity in the combined sewer system.

16.

Before construction of the CSO treatment facilities, when the amount of storm water runoff and sewage exceeded the capacity of Atlanta's sewer system, the CSOs allowed the overflow of untreated waste to empty directly into tributaries of the Chattahoochee River.

## D. *THE CSO TREATMENT FACILITIES*

17.

A CSO treatment facility receives the overflow of storm water and waste from a CSO. Atlanta agreed to build treatment facilities

for the overflow from four CSOs. Atlanta decided to build a separate sanitary sewer system in the fifth CSO area.

18.

Overflow events may involve millions of gallons of stormwater runoff and sewage. Atlanta does not measure the volume of the overflows. In a CSO treatment facility the storm water and sewage is continuously moving from the time it enters the facility until the time it leaves. The facility removes any debris by passing the stormwater runoff and sewage through a bar screen to remove large garbage (e.g., tires and soda bottles) and a drum screen that removes small garbage (e.g., cigarette butts). The facility then adds chlorine to the stormwater runoff and sewage to kill bacteria (e.g., fecal coliform bacteria). The facility then discharges the treated waste into a tributary of the Chattahoochee River. The means of discharge is different at the different treatment facilities.

19.

The Proctor Creek/North Avenue facility [hereinafter the North Avenue Facility] began operating in July, 1994. It discharges its treated waste into a square-shaped underground pipe, called an enclosed box culvert. This enclosed box culvert is approximately 200 yards long and discharges into Proctor Creek, a tributary of the Chattahoochee River. The North Avenue Facility is one of the facilities subject to this lawsuit.

20.

The Proctor Creek/Greensferry facility [hereinafter the Greensferry Facility] began operating in January, 1994. It discharges its treated waste into a concrete lined open ditch, called an open culvert. This open culvert is approximately 350 yards long and also discharges into Proctor Creek. The Greensferry Facility is one of the facilities subject to this lawsuit.

21.

The Tanyard Creek facility began operating in July, 1994. It also expels its treated waste into an open culvert. This open culvert is approximately eight-tenths of a mile long and discharges into Peachtree Creek, which is a tributary of the Chattahoochee River. The Tanyard Creek Facility is one of the facilities subject to this lawsuit.

22.

The Clear Creek facility was under construction at the time the Plaintiffs filed this lawsuit. In the past and up to a recent date CSO waste at this location flowed untreated into Clear Creek, a tributary of the Chattahoochee River. The Clear Creek facility was completed in July 1997. Until its completion, Atlanta was paying civil penalties of $10,000 per day for its delayed construction.

23.

Because the CSOs overflow only when a significant rainfall event occurs, the vast majority of the storm water and sewage entering CSO treatment facilities consists of storm water. The Environmental Protection Division and Atlanta contend that between 1% and 3% of the water entering a CSO facility at the time of a significant rainfall event is sewage. The Plaintiffs contend that between 3% and 5% is sewage.

24.

At Utoy Creek, the fifth CSO, Atlanta has agreed to separate the storm water pipes from the sewer pipes. Atlanta represents that this separation will be complete by July of 1998. In the past and through the present date, this CSO discharged untreated waste directly into Utoy Creek, a tributary of the Chattahoochee River. Atlanta is paying civil penalties of $10,000 per day for the delayed separation of the combined sewer system.

25.

North Avenue, Greensferry, and Tanyard Creek CSOs are addressed by the Clean Water Act Claim in Count II and the nuisance claim in Count III and the trespass claim in Count IV.

26.

The Clear Creek and Utoy Creek CSOs are not addressed by the Clean Water Act Claim in Count II but are addressed by nuisance and trespass claims in Counts III and IV respectively.

### E. *THE CSO PERMITS*

#### 27.

On or about March 31, 1992 the Georgia Environmental Protection Division issued National Pollutant Discharge Elimination System Permits [hereinafter "the Permits"] to Atlanta for the CSOs as follows: North Avenue—No. GA0037117, Greensferry—No. GA0037125, and Tanyard Creek—No. GA0037109. Each of these permits is substantively identical. Part I contains definitions and Part III contains general requirements. Part II imposes effluent limitations and requires monitoring and reporting.

#### 1. *WATER QUALITY STANDARDS*

#### 28.

The Permits provide that overflows must not cause violations of Georgia Water Quality Standards as set forth at 391-3-6.03 of the Rules and Regulations for Water Quality Control. Georgia Water Quality Standards apply to "all waters of the State." Georgia statutory law defines "all waters of the State" as "any and all rivers, streams, creeks, branches, lakes, reservoirs, ponds, drainage systems, springs, wells, wetlands, and all other bodies of surface or subsurface water, natural or artificial, lying within or forming a part of the boundaries of the State which are not entirely confined and retained completely upon the property of a single individual, partnership, or corporation." O.C.G.A. § 12–5–22(13).

#### 29.

The parties are in dispute as to whether the discharge that has left the CSO treatment facility (i.e., the waste in the culverts) but has not yet been discharged into the receiving stream is considered part of the stream for determining compliance with Georgia Water Quality Standards. The Plaintiffs and the EPD say they are "waters of the State" and therefore must comply with Georgia Water Quality Standards. Atlanta contends that the water in the culverts does not have to comply with Georgia Water Quality Standards because it has neither entered nor mixed with the receiving stream.

#### 30.

The Permits state that treated waste from CSO treatment facilities must not produce materials that settle to form sludge deposits that become putrescent, unsightly or interfere with legitimate water uses. Treated waste from CSO treatment facilities must not produced oil, scum and floating debris in amounts sufficient to be unsightly or interfere with legitimate water uses. Treated waste from CSO treatment facilities must not produce materials that produce turbidity, color, odor, or other objectionable conditions that interfere with legitimate water uses. Treated waste from CSO treatment facilities must not cause toxic, corrosive, acidic and caustic substances in amounts, concentrations or combinations that are harmful to humans, animals or aquatic life.

#### 31.

The Permits provide that Atlanta must design CSO treatment facilities so that they can adequately treat waste during a "design storm event" according to a CSO plan submitted to and approved by the EPD. The Permits define such an event as one with .25 inches of rainfall per hour with a one hour duration.

#### 32.

The EPD has accepted the CSO plan submitted by Atlanta with respect to the design parameters of Atlanta's CSO treatment facilities.

#### 33.

The CSO treatment facilities are not consistently meeting the design objective of reducing the fecal coliform count in the treated waste to 400/100 ml. This measurement refers to the number of colonies of fecal coliform bacteria that may be grown from a 100 ml water sample.

#### 2. *MONITORING*

#### 34.

The Permits provide that Atlanta must provide adequate funding and staffing to meet all of the Permit's requirements. Atlanta has used one team of two people to perform the monitoring and sampling required by the Permits.

### i. RAINFALL MONITORING

35.

The Permits provide that Atlanta must monitor the rainfall at a location that provides data representative of the amount of storm water entering into the combined sewer system and the amount of overflow occurring through the CSOs for the three completed CSO treatment facilities.

36.

Before August of 1995, Atlanta collected data from rainfall gauges outside the sewer sheds of the three CSO treatment facilities.

37.

After August of 1995, Atlanta installed rainfall gauges at each CSO facility.

38.

In October of 1996, Atlanta moved the gauge from the Tanyard Creek facility to Georgia Tech.

### ii. FIRST FLUSH MONITORING

39.

The Permits state that every third time one of these CSOs overflow, Atlanta must obtain a "first flush" sample from three locations representative of: (1) the point where the treated waste has left the CSO treatment facility but has not yet entered the stream; (2) upstream of the point where the treated waste enters the stream; and (3) downstream of the point where the treated waste enters the stream. A "first flush" sample is one taken within the first 60 minutes of the overflow.

40.

Before September 1996, Atlanta's single monitoring team attempted to but was unable to perform the first flush sampling at all three facilities when all three sites were operating simultaneously. They were unable to travel between the three sites during the first hour of the overflow event due to distance and traffic.

41.

Since September of 1996, Atlanta staggers the monitoring of the CSO treatment facilities so that it monitors only one facility during any particular overflow event.

42.

Atlanta contends that first flush monitoring is not meaningful in light of studies that show that during an overflow there is no uniform time when higher levels of either metals or fecal coliform are released.

### iii. COMPOSITE MONITORING

43.

The Permits require that Atlanta must obtain composite samples from three locations representative of: (1) the point where the treated waste has left the CSO treatment facility but has not yet entered the stream; (2) upstream of the point where the treated waste enters the stream; and (3) downstream of the point where the treated waste enters the stream. A composite sample is a combination of a series of samples taken at least once per hour during the overflow.

44.

Atlanta submitted Discharge Monitoring Reports to EPD showing that it performed composite sampling when, in fact, it did not.

45.

From time to time, Atlanta ran tests that the EPD required only for composite samples on any first flush samples Atlanta collected. They did so even if was not required to obtain composite samples because the overflow event lasted less than an hour.

46.

The Permits require Atlanta to take composite samples if and only if the overflow event lasts more than one hour. Every third overflow event does not necessarily last more than an hour.

### iv. The Sampling Plan

47.

The Permits provide that Atlanta was supposed to submit to the EPD for approval a plan that showed how it would collect the samples. Atlanta has not submitted and has not obtained approval of a sampling plan.

**48.**

EPD has not taken any enforcement action in response to Atlanta's failure to submit a sampling plan.

**49.**

Atlanta contends that the monitoring requirements of the Permits do not provide adequate data about each overflow event to detect the impact of that overflow event on the receiving stream. Therefore, it has not fully complied with the requirements in the Permits.

**50.**

Atlanta contends that even if it implemented a monitoring plan consistent with the Permits, it would not provide meaningful data about whether a CSO treatment facility's treated waste was the cause of a violation of water quality standards. However, Atlanta also contends that if it analyzes the data collected from the sampling plan with other types of water quality data, it may provide useful information about the water quality of the receiving streams and the CSO treatment facility's impact on that stream.

### 3. REPORTING

**51.**

Atlanta must collect the results of these samples in Discharge Monitoring Reports. Atlanta submits these reports to the EPD and retains a copy for five years.

**52.**

Atlanta has not maintained records showing the time when it collected samples. The Plaintiffs contend that this violates the Permits' record keeping requirements. Atlanta contends that the Permits do not require it to record the time at which it collected samples.

### 4. ALTERNATIVE POWER SOURCE

**53.**

Atlanta must maintain an alternate power source to ensure compliance with the Permits in the event main power fails.

**54.**

As of August 27, 1996, Atlanta had no alternate power source in place at any of the three CSOs.

**55.**

When main power is lost, the CSO treatment facilities shut down. The only treatment provided is screening of the waste until the screens become too clogged.

**56.**

Atlanta is installing back up generators at this time.

## F. SPECIFIC SAMPLE MEASUREMENTS VIOLATING WATER QUALITY STANDARDS

**57.**

Samples taken before the treated waste is discharged into the natural receiving stream from the three CSO treatment facilities do not comply with Georgia water quality standards.

### 1. THE NORTH AVENUE CSO TREATMENT FACILITY'S CULVERT

**58.**

Since the North Avenue CSO facility became operational through September, 1996, there have been approximately 91 overflow events. Approximately 30 have been monitored. On ten occasions in 1995 and 1996 during CSO overflow events, rainfall in the North Avenue CSO watershed did not exceed .25 inches per hour during any hour of the CSO event. Those dates were as follows: February 10, 1995; February 17, 1995; April 11, 1995; August 4, 1995; August 25, 1995; September 23, 1995; January 11, 1996; February 28, 1996; March 25, 1996; July 15, 1996.

**59.**

Fecal Coliform Bacteria—In 1995 and 1996, samples taken from the culverts flowing from the North Avenue Treatment Facility on ten occasions included bacteria in quantities greater than the 400/ 100 ml standard. Concentrations of bacteria on the following dates were: February 10, 1995—560,000/100 ml; February 17, 1995—230,000/100 ml; April 11, 1995—47,000/100 ml; November 11, 1995—100,000/100 ml; December 18, 1995—22,000/100 ml; January 11, 1996—80,000/100 ml; January 26, 1996—53,000/100 ml; Feb-

ruary 28, 1996—53,000/100 ml; March 25, 1996—520,000/100 ml; April 29, 1996—32,000/100 ml.

60.

Cadmium—In 1995 and 1996, samples taken from the culverts flowing from the North Avenue Treatment Facility on four occasions included cadmium in quantities greater than the 0.7 ug/L. standard. Concentrations of cadmium on the following dates were: April 11, 1995—2.0 ug/L; September 23, 1995—2.0 ug/L; November 11, 1995—1.0 ug/L; April 29, 1996—1.0 ug/L.

61.

Copper—In 1995 and 1996, samples taken from the culverts flowing from the North Avenue Treatment Facility on fifteen occasions included copper in quantities greater than the 6.5 ug/L. standard. Concentrations of copper on the following dates were: November 28, 1994—22.0 ug/L; April 11, 1995—238.0 ug/L; May 15, 1995—38.0 ug/L; June 1, 1995—40.0 ug/L; August 4, 1995—44.0 ug/L; August 25, 1995—67.0 ug/L; September 23, 1995—27.0 ug/L; October 27, 1995—25.0 ug/L; November 11, 1995—15.0 ug/L; December 18, 1995—35.0 ug/L; January 11, 1996—24.0 ug/L; February 28, 1996 27.0 ug/L; March 25, 1996 39.0 ug/L; April 29, 1996—23.0 ug/L; July 15, 1996—28.0 ug/L.

62.

Lead—In 1995 and 1996, samples taken from the culverts flowing from the North Avenue Treatment Facility on seven occasions included lead in quantities greater than the 1.3 ug/L. standard. Concentrations of lead on the following dates were: November 28, 1994—11.0 ug/L; May 15, 1995—9.0 ug/L; June 1, 1995—4.0 ug/L; August 25, 1995—2.0 ug/L; September 23, 1995—22.0 ug/L; October 27 1995—13.0 ug/L; April 29, 1996—10.0 ug/L.

63.

Zinc—In 1995 and 1996, samples taken from the culverts flowing from the North Avenue Treatment Facility on fourteen occasions included zinc in quantities greater than the 60 ug/L. standard. Concentrations of zinc on the following dates were: November 28, 1994—76.0 ug/L; April 11, 1995 1,315.0 ug/L; May 15, 1995—151.0 ug/L; June 1, 1995—87.0 ug/L; August 4, 1995—177.0 ug/L; August 25, 1995—158.0 ug/L; September 23, 1995—149.0 ug/L; October 27, 1995—168.0 ug/L; November 11, 1995—86.0 ug/L; January 11, 1996—184.0 ug/L; February 28, 1996—169.0 ug/L; March 25, 1996—399.0 ug/L; April 29, 1996—129.0 ug/L; July 15, 1996—171.0 ug/L.

## 2. THE GREENSFERRY CSO TREATMENT FACILITY'S CULVERT

64.

Since the Greensferry CSO facility became operational through September, 1996, there have been approximately 88 overflow events. Approximately 29 have been monitored. In 1995 and 1996, on thirteen occasions during CSO overflow events, rainfall in the Greensferry watershed did not exceed .25 inches per hour during any hour of the CSO event. Those dates were as follows: January 14, 1995; January 19, 1995; February 10, 1995; April 11, 1995; June 5, 1995; August 4, 1995; August 25, 1995; September 23, 1995; January 11, 1996; February 28, 1996; March 25, 1996; June 25, 1996; July 15, 1996.

65.

Fecal Coliform Bacteria—In 1995 and 1996, samples taken from the culverts flowing from the Greensferry Treatment Facility on nine occasions included bacteria in quantities greater than the 400/100 ml standard. Concentrations of bacteria on the following dates were: January 14, 1995—2,000,000/100 ml; January 19, 1995—163,636/100 ml; February 10, 1995—60,000/100 ml; April 11, 1995—400,000/100 ml; November 11, 1995—72,727/100 ml; January 11, 1996—54,545/100 ml; January 26, 1996—400,000/100 ml; February 28, 1996—34,500/100 ml; March 25, 1996—240,000/100 ml.

66.

Cadmium—In 1995 and 1996, samples taken from the culverts flowing from the Greensferry Treatment Facility on four occasions included cadmium in quantities greater than the 0.7 ug/L. standard. Concentrations of cadmium on the following dates were: April 11, 1995—2.0 ug/L; September 23, 1995—4.0 ug/L; October 27, 1995—1.0 ug/L; January 11, 1996—1.0 ug/L.

#### 67.

Copper—In 1995 and 1996, samples taken from the culverts flowing from the Greensferry Treatment Facility on seventeen occasions included copper in quantities greater than the 6.5 ug/L. standard. Concentrations of copper on the following dates were: November 28, 1994—10.0 ug/L; April 11, 1995—82.0 ug/L; May 15, 1995—31.0 ug/L; June 1, 1995—22.0 ug/L; June 5, 1995—37.0 ug/L; August 4, 1995—24.0 ug/L; August 25, 1995—39.0 ug/L; September 23, 1995—18.0 ug/L; October 27, 1995—24.0 ug/L; November 11, 1995—18.0 ug/L; December 18, 1995—22.0 ug/L; January 11, 1996—18.0 ug/L; February 28, 1996—11.0 ug/L; March 25, 1996—21.0 ug/L; April 29, 1996—13.0 ug/L; June 25, 1996—10.0 ug/L; July 15, 1996—8.0 ug/L.

#### 68.

Lead—In 1995 and 1996, samples taken from the culverts flowing from the Greensferry Treatment Facility on four occasions included lead in quantities greater than the 1.3 ug/L. standard. Concentrations of lead on the following dates were: April 11, 1995—11.0 ug/L; May 15, 1995—24.0 ug/L; September 23, 1995—13.0 ug/L; October 27, 1995—51.0 ug/L.

#### 69.

Zinc—In 1995 and 1996, samples taken from the culverts flowing from the Greensferry Treatment Facility on fourteen occasions included zinc in quantities greater than the 60 ug/L. standard. Concentrations of zinc on the following dates were: April 11, 1995—1,048 ug/L; May 15, 1995—224 ug/L; June 1, 1995—62 ug/L; June 5, 1995—269 ug/L; August 4, 1995—91 ug/L; August 25, 1995—131 ug/L; September 23, 1995—80 ug/L; October 27, 1995—140 ug/L; November 11, 1995—100 ug/L; December 18, 1995—143 ug/L; January 11, 1996—133 ug/L; January 26, 1996—104 ug/L; March 25, 1996—103 ug/L; April 29, 1996—81 ug/L.

#### 3. *THE TANYARD CREEK CSO TREATMENT FACILITY'S CULVERT*

#### 70.

Since the Tanyard Creek CSO facility became operational and through September,

1996, there have been approximately 88 overflow events. Approximately 29 have been monitored. In 1995 and 1996, on 16 occasions during CSO overflow events, rainfall in the Tanyard Creek watershed did not exceed .25 inches per hour during any hour of the CSO event. Those dates were as follows: January 14, 1995; January 19, 1995; February 17, 1995; April 11, 1995; June 25, 1995, August 4, 1995; August 25, 1995; September 21, 1995; September 23, 1995; October 27, 1995; January 11, 1996; February 28, 1996; March 25, 1996; April 29, 1996; June 25, 1996. July 15, 1996.

#### 71.

Fecal Coliform Bacteria—In 1995 and 1996, samples taken from the culverts flowing from the Tanyard Creek Treatment Facility on eight occasions included bacteria in quantities greater than the 400/100 ml standard. Concentrations of bacteria on the following dates were: November 28, 1994—1,4000,000/100 ml; January 14, 1995—340,-000/100 ml; January 19, 1995—70,000/100 ml; February 17, 1995—1,000,000/100 ml; April 11, 1995—320,000/100 ml; February 28, 1996—50,000/100 ml; March 25, 1996—63,-636/100 ml; April 29, 1996—16,364/100 ml.

#### 72.

Cadmium—In 1995 and 1996, samples taken from the culverts flowing from the Tanyard Creek Treatment Facility on three occasions included cadmium in quantities greater than the 0.7 ug/L. standard. Concentrations of cadmium on the following dates were: April 11, 1995—2.0 ug/L; September 21, 1995—2.0 ug/L; October 27, 1995—1.0 ug/L.

#### 73.

Copper—In 1995 and 1996, samples taken from the culverts flowing from the Tanyard Creek Treatment Facility on thirteen occasions included copper in quantities greater than the 6.5 ug/L. standard. Concentrations of copper on the following dates were: November 28, 1994—12.0 ug/L; April 11, 1995—56.0 ug/L; May 15, 1995—33.0 ug/L; June 1, 1995—20.0 ug/L; August 4, 1995—

27.0 ug/L; August 25, 1995—76.0 ug/L; September 23, 1995—11.0 ug/L; October 27, 1995—11.0 ug/L; November 11, 1995—8.0 ug/L; February 28, 1996—10.0 ug/L; March 25, 1996—22.0 ug/L; June 25, 1996—17.0 ug/L; July 15, 1996—16.0 ug/L.

74.

Lead—In 1995 and 1996, samples taken from the culverts flowing from the Tanyard Creek Treatment Facility on five occasions included lead in quantities greater than the 1.3 ug/L. standard. Concentrations of lead on the following dates were: November 28, 1994—5.0 ug/L; April 11, 1995—2.0 ug/L; October 27, 1995—6.0 ug/L; January 11, 1996—3.0 ug/L; June 25, 1996—8.0 ug/L.

75.

Zinc—In 1995 and 1996, samples taken from the culverts flowing from the Tanyard Creek Treatment Facility on eleven occasions included zinc in quantities greater than the 60 ug/L. standard. Concentrations of Zinc on the following dates were: November 28, 1994—86.0 ug/L; April 11, 1995—247.0 ug/L; May 15, 1995—155.0 ug/L; June 1, 1995—78.0 ug/L; June 25, 1995—67.0 ug/L; August 4, 1995—101.0 ug/L; August 25, 1995—167.0 ug/L; September 23, 1995—222.0 ug/L; June 25, 1996—88.0 ug/L; July 15, 1996—72.0 ug/L.

76.

Downstream samples taken below the CSO Treatment Facilities after the treated waste is mixed with the natural receiving stream do not comply with water quality standards.

4. *DOWNSTREAM FROM THE NORTH AVENUE CSO TREATMENT FACILITY*

77.

Fecal Coliform Bacteria—In 1995 and 1996, samples taken from Proctor Creek downstream of the North Avenue CSO Treatment Facility on seven occasions included bacteria in quantities greater than the 400 MPN/100 ml standard. Concentrations of bacteria on the following dates were: February 17, 1995—8,182/100 ml; December 18, 1995—45,000/100 ml; January 11, 1996—163,636/100 ml; January 26, 1996—36,-000/100 ml; February 28, 1996—38,000/100 ml; March 25, 1996—480,000/100 ml; April 29, 1996—18,018/100 ml.

78.

Cadmium—In 1995 and 1996, samples taken from Proctor Creek downstream of the North Avenue CSO Treatment Facility on two occasions included cadmium in quantities greater than the 0.7 ug/L. standard. Concentrations of cadmium on the following dates were: November 11, 1995—1.0 ug/L; April 29, 1996—1.0 ug/L.

79.

Copper—In 1995 and 1996, samples taken from Proctor Creek downstream of the North Avenue CSO Treatment Facility on eight occasions included copper in quantities greater than the 6.5 ug/L. standard. Concentrations of copper on the following dates were: November 28, 1994—20.0 ug/L; August 4, 1995—76.0 ug/L; August 28, 1995—60.0 ug/L; November 11, 1995—15.0 ug/L; December 18, 1995—67.0 ug/L; January 11, 1996—51.0 ug/L; February 28, 1996—9 ug/L; March 25, 1996—67.0 ug/L.

80.

Lead—In 1995 and 1996, samples taken from Proctor Creek downstream of the North Avenue CSO Treatment Facility on three occasions included lead in quantities greater than the 1.3 ug/L. standard. Concentrations of lead on the following dates were: November 28, 1994—3.0 ug/L; September 23, 1995—9.0 ug/L; April 29, 1996—19.0 ug/L.

81.

Zinc—In 1995 and 1996, samples taken from Proctor Creek downstream of the North Avenue CSO treatment facility on eight occasions included zinc in quantities greater than the 60 ug/L. standard. Concentrations of zinc on the following dates were: August 4, 1995—323.0 ug/L; August 25, 1995—144.0 ug/L; October 27, 1995—152.0 ug/L; November 11, 1995—75.0 ug/L; January 11, 1996—353.0 ug/L; February 8, 1996—72.0 ug/L; March 25, 1996—82.0 ug/L; July 15, 1996—268.0 ug/L.

### 5. *DOWNSTREAM FROM THE GREENSFERRY CSO TREATMENT FACILITY*

#### 82.

Fecal Coliform Bacteria—In 1995 and 1996, samples taken from Proctor Creek downstream of the Greensferry CSO treatment facility on nine occasions included bacteria in quantities greater than the 400/100 ml standard. Concentrations of bacteria on the following dates were: January 14, 1995—109,091/100 ml; January 19, 1995—32,500/100 ml; February 10, 1995—60,000/100 ml; April 11, 1995—37,000/100 ml; November 11, 1995—145,455/100 ml; January 11, 1996—27,273/100 ml; January 26, 1996—54,000/100 ml; February 28, 1996—5,000/100 ml; March 25, 1996—118,182/100 ml.

#### 83.

Cadmium—In 1995 and 1996, samples taken from Proctor Creek downstream of the Greensferry CSO treatment facility on one occasion included cadmium in quantities greater than the 0.7 ug/L. standard. Concentration of cadmium on October 27, 1995 was 1.0 ug/L.

#### 84.

Copper—In 1995 and 1996, samples taken from Proctor Creek downstream of the Greensferry CSO treatment facility on four occasions included copper in quantities greater than the 6.5 ug/L. standard. Concentrations of copper on the following dates were: June 1, 1995—20.0 ug/L; August 4, 1995—33.0 ug/L; November 11, 1995—15.0 ug/L; June 26, 1996—26.0 ug/L.

#### 85.

Lead—In 1995 and 1996, samples taken from Proctor Creek downstream of the Greensferry CSO treatment facility on two occasions included lead in quantities greater than the 1.3 ug/L. standard. Concentrations of lead on the following dates were: October 27, 1995—44.0 ug/L; November 11, 1995—2.0 ug/L.

#### 86.

Zinc—In 1995 and 1996, samples taken from Proctor Creek downstream of the Greensferry.CSO treatment facility on nine occasions included zinc in quantities greater than the 60 ug/L. standard. Concentrations of zinc on the following dates were: April 11, 1995—442.0 ug/L; May 15, 1995—153.0 ug/L; August 25, 1995—78.0 ug/L; September 23, 1995—56.0 ug/L; October 27, 1995—156.0 ug/L; November 11, 1995—93.0 ug/L; December 18, 1995—120.0 ug/L; January 26, 1996—62.0 ug/L; April 29, 1996—94.0 ug/L.

### 6. *DOWNSTREAM FROM THE TANYARD CREEK CSO TREATMENT FACILITY*

#### 87.

Fecal Coliform Bacteria—In 1995 and 1996, samples taken from Peachtree Creek downstream of the Tanyard Creek CSO treatment facility on two occasions included bacteria in quantities greater than the 400/100 ml standard. Concentrations of bacteria on the following dates were: March 25, 1996—218,182/100 ml; April 29, 1996—4,100/100 ml.

#### 88.

Cadmium—In 1995 and 1996, samples taken from Peachtree Creek downstream of the Tanyard Creek CSO treatment facility on no occasions included cadmium in quantities greater than the 0.7 ug/L. standard.

#### 89.

Copper—In 1995 and 1996, samples taken from Peachtree Creek downstream of the Tanyard Creek CSO treatment facility on twelve occasions included copper in quantities greater than the 6.5 ug/L. standard. Concentrations of copper on the following dates were: November 28, 1994—26.0 ug/L; April 11, 1995—56.0 ug/L; May 15, 1995—31.0 ug/L; June 1, 1995—22.0 ug/L; June 25, 1995—15.0 ug/L; August 4, 1995—29.0 ug/L; August 25, 1995—62.0 ug/L; September 23, 1995—53.0 ug/L; February 28, 1996—30.0 ug/L; March 25, 1996—27.0 ug/L; June 25, 1996—22.0 ug/L; July 15, 1996—37.0 ug/L.

#### 90.

Lead—In 1995 and 1996, samples taken from Peachtree Creek downstream of the Tanyard Creek CSO treatment facility on two occasions included lead in quantities greater than the 1.3 ug/L. standard. Concentrations of lead on the following dates

were: April 11, 1995—7.0 ug/L; June 25, 1996—8.0 ug/L.

### 91.

Zinc—In 1995 and 1996, samples taken from Peachtree Creek downstream of the Tanyard Creek CSO treatment facility on nine occasions included zinc in quantities greater than the 60 ug/L. standard. Concentrations of zinc on the following dates were: April 11, 1995—244.0 ug/L; May 15, 1995—175.0 ug/L; June 1, 1995—77.0 ug/L; August 4, 1995—99.0 ug/L; August 25, 1995—140.0 ug/L; September 23, 1995—291.0 ug/L; February 28, 1996—185.0 ug/L; June 25, 1996—85.0 ug/L; July 15, 1996—165.0 ug/L.

## II. DISCUSSION

### A. SUMMARY OF PLAINTIFFS' CLAIMS

The Plaintiffs claim that Atlanta violated the Clean Water Act in that it has: (1) failed to monitor the CSO treatment facilities pursuant to an approved sampling plan as required by the Permits; (2) failed to monitor rainfall as required by the Permits; (3) failed to conduct first flush sampling as required by the Permits; (4) failed to conduct composite sampling as required by the Permits; (5) maintained inadequate staffing levels, as required by the Permits, to allow proper monitoring;[1] (6) failed to design the CSO treatment facilities so that they can adequately treat the waste that passes through them; (7) failed to design the CSO treatment facilities to treat adequately the waste that passes though them as required by the Permits; (8) violated Georgia Water Quality Standards with respect to the quality of the discharge from the CSO facilities; (9) failed to maintain an alternate power source as required by the Permits;[2] and (10) failed to maintain accurate records regarding its monitoring of the CSO treatment facilities as required by the Permits in that (a) it reported first flush samples as though they were composite samples; and (b) did not record the time that it took first flush samples until August or September of 1996, and therefore, verification of those first flush samples is not possible. The Plaintiffs also claim that Atlanta, by discharging untreated and inadequately treated waste into the tributaries of the Chattahoochee River, has created an unhealthy and offensive condition that constitutes trespass against those who own property along the river. Finally, the Plaintiffs also claim that Atlanta, by discharging untreated and inadequately treated waste into the tributaries of the Chattahoochee River, has created an unhealthy and offensive condition that has interfered with the Plaintiffs' use and enjoyment of the river and is a nuisance.

### B. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the non movant. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).[3]

### C. TRESPASS

Atlanta claims that the Plaintiffs do not have standing to pursue their claims for trespass and nuisance. To assert a claim for

---

**1.** Atlanta claims that the Plaintiffs cannot raise this violation because they did not provide proper notice.

**2.** Atlanta claims that the Plaintiffs cannot raise this violation because they did not provide proper notice.

**3.** The Clean Water Act claims in Count I of the Complaint were resolved in favor of Atlanta in the Court's Order dated December 11, 1996 granting summary judgment in favor of Atlanta as to those claims.

trespass to realty in Georgia, a plaintiff must either be in possession of or have title to the property. O.C.G.A. § 51–9–4. In order to recover for trespass, a plaintiff must prove that the trespass has actually caused some damage to the property. *Berman v. Rubin,* 138 Ga.App. 849, 855, 227 S.E.2d 802 (1976). It is not enough that a plaintiff might suffer damage at some point in the future. *Dept. of Transp. of Georgia v. Bonnett,* 257 Ga. 189, 190, 358 S.E.2d 245 (1987). The City of West Point, the City of LaGrange, The City of Hogansville, Troup County, Heard County, Harris County, The Upper Chattahoochee Riverkeeper Fund, Inc., the Upper Chattahoochee Riverkeeper, Inc., and the LaGrange–Troup County Chamber of Commerce do not own any property along the Chattahoochee River. The members of the Lake Harding Association own property along the river, but it has not even alleged that they have suffered any injury from Atlanta's alleged violations. It only alleges that they fear they may suffer injury in the future.

█ Plaintiff Robert Hancock does own property on the Chattahoochee River approximately 70 miles downstream of Atlanta. However, he has not shown that pollution from the CSO treatment facilities and the other spills and overflows complained of have *caused* any damage he may have sustained. Even assuming that the water flowing past his property is polluted and assuming that the pollution of that water has somehow damaged his property, Mr. Hancock must show that Atlanta is responsible for the pollution. It is undisputed that there are multiple sources of pollution upstream of this Plaintiff's property. The Plaintiffs have not offered any scientific or even non-scientific evidence as to the nature and source of the alleged pollution in the river adjacent to Mr. Hancock's property. No water quality testing has been conducted at or near Mr. Hancock's property. Evidence that is completely inconclusive cannot support a claim for trespass. *Jordan v. Georgia Power Co.,* 219 Ga.App. 690, 694–695, 466 S.E.2d 601 (1995). Under these circumstances, the mere allegation that the river is polluted is insufficient to create a genuine issue of disputed fact. Mr. Hancock's opinion that his property has been

devalued (Dep. Robert Hancock, pp. 48–49) as a result of Atlanta's pollution of the Chattahoochee River is insufficient to withstand summary judgment. Similarly, the speculation and conjecture of Dr. Kamps and Dr. Bayne that Atlanta is contributing in some unspecified degree to elevated fecal coliform levels in the River immediately upstream from West Point lake is insufficient to create a disputed issue of material fact as to the claims for trespass. Accordingly, Atlanta is entitled to summary judgment as to the Plaintiffs' trespass claims.

### D. *NUISANCE*

█ It is unclear whether the Plaintiffs seek to recover for public or private nuisance. Regardless, the Plaintiffs' claims must fail. A claim for public nuisance must be brought either by a district attorney or by an individual who can show special damage. O.C.G.A. § 41–2–2. Here none of the Plaintiffs satisfy either requirement for maintaining a claim for public nuisance. As to private nuisance, the Plaintiffs' claims are for nuisance against property. Similar to a trespass claim, it is necessary that a plaintiff with a claim for nuisance against property show that he owns the property, *Cox v. De Jarnette,* 104 Ga.App. 664, 675–76, 123 S.E.2d 16 (1961), that the nuisance has injured the property, *Bonnett,* 257 Ga. at 190, 358 S.E.2d at 246, and that the defendant proximately caused the injury to the property, *Citizens & Southern Trust Co. v. Phillips Petroleum Co., Inc.,* 192 Ga.App. 499, 499–500, 385 S.E.2d 426 (1989). It must be shown that the injury is the natural and proximate consequence of the acts of the defendant and not the acts of others. *Id.* As shown in this Court's discussion the Plaintiffs' claims for trespass, none of the Plaintiffs have shown both that they own land along the Chattahoochee River and that Atlanta's acts have caused ascertainable damage to their property. Therefore, Atlanta is entitled to summary judgment on the Plaintiffs' claims for nuisance.

### E. *CLEAN WATER ACT CLAIMS*

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical,

and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Clean Water Act governs the discharge of pollutants into the navigable waters of the United States. 33 U.S.C. § 1362(7). The United States Environmental Protection Agency can issue National Pollutant Discharge Elimination System permits that entitle the permitee to discharge pollutants into the navigable waters of the United States when the discharge would otherwise violate the Clean Water Act. 33 U.S.C. § 1342. The EPA has given the Georgia Department of Natural Resources, Environmental Protection Division (hereinafter "the EPD") the authority to issue the Permits pursuant to the Georgia Water Quality Control Act. 33 U.S.C. § 1342(b)-(c); O.C.G.A. § 12–5–20 *et seq.* The discharge of effluent from the CSO treatment facilities constitutes the discharge of pollutants into navigable waters of the United States within the meaning of the Clean Water Act. 33 U.S.C. §§ 1311, 1342. In 1990, the Georgia General Assembly passed legislation requiring the elimination, treatment and/or control of combined sewer overflows. This legislation prohibited the operation of a CSO except pursuant to a permit issued by the EPD. *See* O.C.G.A. § 12–5–29.1. In 1992, Atlanta obtained permits for each of the CSO treatment facilities from the EPD. Each Permit placed identical burdens on Atlanta.

The Clean Water Act grants to citizens the right to file suit in federal court to enforce the Act. 33 U.S.C. § 1365(a). Any citizen may sue on his own behalf any governmental instrumentality or agency to enforce an effluent standard or limitation or an order issued with respect to an effluent standard or limitation. *Id.* The violation of a permit is a violation of an effluent standard under the Clean Water Act. 33 U.S.C. § 1365(f). The district courts have jurisdiction of the action, without regard to the citizenship of the parties or the amount in controversy. 33 U.S.C. § 1365(a). The court may enforce the order or effluent standard or limitation and may impose the civil penalties authorized by the Act. *Id.* The civil penalties may not exceed $25,000 per day for each violation. 33 U.S.C. § 1319(d). In Count II of their Complaint, Plaintiffs seek relief under these provisions

of the Clean Water Act. Atlanta does not contend that this action is barred by 33 U.S.C. § 1365(b)(1)(B) (citizen suits barred where state or federal government is diligently prosecuting civil or criminal actions to require compliance) or 33 U.S.C. § 1319(g)(6) (citizen suits barred where administrative actions are being diligently prosecuted).

■ Atlanta claims that Plaintiffs may not pursue some of their Clean Water Act claims because they did not provide Atlanta with adequate notice of the alleged violations. Before filing a citizen suit under the Clean Water Act, a potential plaintiff must first provide 60 days notice of the alleged violation to the alleged violator. 33 U.S.C. § 1365(b). Atlanta claims that Plaintiffs failed to provide such notice as to several of their claims. However, the language of Plaintiffs' notice was broad enough to encompass all of the claims raised by Plaintiffs except Atlanta's failure to provide an alternate power source. Therefore, Atlanta is entitled to summary judgment only as to that claim.

■ Atlanta also asserts that the City of West Point, the City of LaGrange, The City of Hogansville, Troup County, Heard County, Harris County, the Lake Harding Association and the LaGrange–Troup County Chamber of Commerce all lack standing to assert claims under the Clean Water Act. The Court agrees. These Plaintiffs have submitted no evidence that either they as entities or their citizens have suffered an injury that is directly traceable to pollution from the CSO facilities. *Friends of the Earth v. Crown Cent. Petroleum,* 95 F.3d 358, 360 (5th Cir.1996); *Save Our Community v. EPA,* 971 F.2d 1155, 1161 (5th Cir.1992). Therefore, Atlanta is entitled to summary judgment as to these Plaintiffs' Clean Water Act claims. It is undisputed that the Plaintiffs Upper Chattahoochee Riverkeeper Fund, Inc. and the Chattahoochee Riverkeeper, Inc. have standing to assert the Clean Water Act claims asserted in the Complaint. In addition, Atlanta has not moved for summary judgment as to the Clean Water Act claims of Robert Hancock. Therefore, the Court will proceed to discuss the

Clean Water Act claims of these three Plaintiffs (hereinafter referred to as "Plaintiffs").

### 1. FAILURE TO OBTAIN AN APPROVED SAMPLING PLAN

 It is undisputed that the Permits require Atlanta to submit, for approval by the EPD, a plan detailing the methodology by which it will collect the samples called for in the Permits. It is also undisputed that before September of 1996 Atlanta had not submitted to the EPD any single formal document that satisfied this requirement. The Permits generally set forth the required sampling information except the exact locations where the upstream and downstream sampling would take place. Atlanta has given the EPD those locations and the EPD has not objected to them. Therefore, Atlanta argues, since the EPD is in possession of and has tacitly accepted the information generally required for an approved sampling plan, it has complied with the Permits' requirement that it obtain an approved sampling plan.

The Permits expressly provide that they set forth the "minimum" elements for an approved sampling plan. The issue here is not whether Atlanta has generally given the EPD the minimum information required by the Permits. With respect to this claim for violation of the Clean Water Act, the issue is whether Atlanta obtained an approved sampling plan as the Permits require. Alan Hallum of EPD testified as follows:

Q: So you are saying that a final sampling plan has never been submitted by the City to EPD?

A: That's what I'm saying . . .

Q: So obviously, therefore, EPD has not approved a sampling plan by the City?

A: Yes.

It will be evident from the discussion below that Atlanta's failure to obtain an approved sampling plan contributes to the difficulty in determining whether it is complying with the requirements of the Permits. This is not a mere technicality that Atlanta can nonchalantly ignore. The undisputed facts show that at the time the Plaintiffs filed this action and until the present, Atlanta has failed to comply with the Permits with respect to having an approved sampling plan. It follows that Atlanta has violated the Clean Water Act with respect to this requirement and the Plaintiffs are entitled to summary judgment as to this claim.

### 2. FAILURE TO MAINTAIN ACCURATE RECORDS

The Permits require Atlanta to maintain accurate records of the results of the required monitoring. The Plaintiffs contend that Atlanta failed to maintain accurate records in three ways.

 First, the Plaintiffs contend that Atlanta failed to record the time that it obtained the samples for each monitored overflow event. It would be helpful to have the time that Atlanta obtained the samples to determine if Atlanta is complying with the required methodology for obtaining samples. Indeed, it would seem to be well within the authority of the EPD to require Atlanta to record this as part of an approved monitoring plan. This is a good example of the kind of issue that should be addressed by Atlanta and the EPD in the submission of and approval of a sampling plan. However, the Permits do not require Atlanta to record the time it obtains samples. Therefore, without an approved sampling plan requiring this, Atlanta is not violating the Permits and the Clean Water Act by failing to record the time that it obtained samples of CSO overflow events.

 Second, the Plaintiffs contend that Atlanta failed to record properly the results of its first flush sampling. Atlanta admits that it failed to perform all of the required first flush monitoring. However, this only shows that Atlanta failed to perform first flush sampling, not that it falsely reported having performed first flush sampling. Without proof that Atlanta falsely reported conducting first flush samples, this admission does not establish a violation of this requirement of the Permits.

 Third, the Plaintiffs contend that Atlanta reported that it had obtained composite samples when it had not. It is undisputed that Atlanta reported metal scans on grab

samples as composite sample results. Atlanta contends that it was unable or not required to obtain composite samples during many of these overflow events and claims that EPD was aware that it was not obtaining composite samples. Even if that is true, EPD's acquiescence is no defense to Atlanta's flagrant falsification of the monitoring reports. Here, Atlanta is again attempting to take advantage of its failure to obtain an approved sampling plan to evade the clear and unequivocal mandate of the Permits. The requirements of the Permits are not mere admonitions that Atlanta can choose to ignore whenever it is convenient to do so. The monitoring reports are public records and the public should be entitled to rely upon them in determining whether Atlanta is complying with the Clean Water Act. Atlanta's admission of intentional and flagrant falsification of the monitoring reports means that it has violated the conditions of the Permits and the Clean Water Act and the Plaintiffs are entitled to summary judgment as to this claim.

### 3. FAILURE TO CONDUCT FIRST FLUSH MONITORING

 The Plaintiffs contend that Atlanta failed to conduct first flush monitoring as required by the Permits. Prior to September of 1996, Atlanta attempted to monitor all three CSO treatment facilities during each overflow event. It relied on only one team to perform the monitoring required by the Permits. First flush monitoring requires that a grab sample be obtained within the first hour of the overflow event. Tyler Richards and Michael Lane, two employees of Atlanta involved with the collection of samples from the CSO treatment facilities, testified that it is physically impossible for someone to drive a circuit between the R.H. Clayton Plant and all three CSO treatment facilities in under an hour. Therefore, it was impossible for Atlanta to collect the grab samples necessary for first flush monitoring. Atlanta has not contested this conclusion. Atlanta admits that "there may be grounds for imposing liability upon the City for some monitoring violations for not collecting 'first flush' samples prior to September, 1996." (Atlanta's Response to Plaintiffs' Statement of Material Facts, p. 14).

Atlanta now staggers sampling of each CSO treatment facility so that a sampling team only has to travel to one facility during any overflow event. However, Atlanta's efforts since September, 1996 do not relieve it of liability for its prior failures. It is undisputed that the Permits required Atlanta to perform first flush sampling every time it monitored an overflow event and it is undisputed that it did not do so. Therefore, the undisputed facts show a violation of the Permits and the Clean Water Act as to this claim.

### 4. FAILURE TO CONDUCT COMPOSITE SAMPLING

 The Plaintiffs claim that Atlanta failed to collect composite samples as required by the Permits. The Plaintiffs claim that any time an overflow event lasts longer than one hour the Permits require a composite sample. Atlanta and the EPD take the position that composite samples are required only if the overflow event lasts two hours or more. The Court accepts the latter interpretation of the requirement for composite sampling. Atlanta admits that it has taken composite samples on only one or two occasions. It is undisputed that many overflow events that should have been monitored lasted more than two hours. Atlanta admits that "there may be grounds for imposing liability upon the City for some monitoring violations for not collecting composite samples...." (Atlanta's Response to Plaintiff's Statement of Material Facts, p. 15). Accordingly, the undisputed facts demonstrate that Atlanta violated the Permits and the Clean Water Act by failing to obtain composite samples and the Plaintiffs are entitled to summary judgment as to this claim.

### 5. FAILURE TO COLLECT REPRESENTATIVE SAMPLES

 The Plaintiffs contend that Atlanta failed to collect representative samples from the receiving streams. It is undisputed that Atlanta collected samples of the water before and after the output from the CSO treatment facilities mixed with the receiving streams.

Again, Atlanta seeks to benefit from its failure to submit a detailed monitoring plan to EPD for its approval. If Atlanta had submitted such a plan, EPD might find that Atlanta was not collecting representative samples. However, the Court cannot make that determination as a matter of law on the record before it. Therefore, the Plaintiffs are not entitled to summary judgment as to this claim.

### 6. FAILURE TO MONITOR RAINFALL PROPERLY

■ The Plaintiffs contend that Atlanta failed properly to monitor the rainfall in the area of the CSOs. The evidence clearly shows that in 1994 Atlanta had rain gauges placed around Atlanta. In August of 1995 Atlanta moved these rain gauges to the CSO treatment facilities. Since then, Atlanta has moved one rain gauge to the Georgia Tech campus. The fact that the rainfall gauges were not in the CSO treatment facilities before August 1995 does not by itself prove that the rainfall measurements were inaccurate or unrepresentative of rainfall in the CSO areas. Again, this is an issue that should be addressed by Atlanta and the EPD in the submission of and approval of a formal sampling and monitoring plan. Therefore, as to this claim, the Plaintiffs have shown no violation of the Permits as a matter of law. The Plaintiffs are not entitled to summary judgment as to this claim.

### 7. FAILURE TO PROVIDE ADEQUATE STAFFING

■ The Plaintiffs contend that Atlanta failed to provide adequate staffing to perform the monitoring and sampling requirements of the Permits. As previously noted, it is impossible for one team to leave the R.H. Clayton Plant and drive a circuit that would allow it to conduct first flush monitoring at all three CSO treatment facilities. Atlanta admits that, prior to September of 1996, it allocated one team to perform the first flush monitoring at all three CSO treatment facilities during the same overflow event. It is undisputed that this team was unable to do this. Therefore, from the beginning of the permit period until September 1996, Atlanta

failed to provide enough personnel to monitor properly all CSO treatment facilities. Again, the fact that Atlanta later staggered testing so that the teams could travel only one CSO during any one overflow event does not relieve Atlanta of its liability. Therefore, the evidence shows that Atlanta violated the conditions of the Permits regarding staffing. The Plaintiffs are entitled to summary judgment as to this claim.

### 8. FAILURE TO PROVIDE ALTERNATE POWER

The Plaintiffs contend that Atlanta failed to provide a backup power source for the CSO treatment facilities. However, as noted above, Atlanta contends that the Plaintiffs may not bring this claim because they failed to provide adequate notice. A plaintiff who anticipates filing a Clean Water Act citizen suit must provide 60 days notice of the alleged violation to the alleged violator. 33 U.S.C. § 1365(b). The Plaintiffs gave such notice with respect to the other alleged Clean Water Act violations. However, they did not provide appropriate notice regarding Atlanta's failure to provide an alternate power source to the CSO treatment facilities. Therefore, failure to provide an alternative power source for the CSO treatment facilities cannot be considered in determining whether the operation of the CSO treatment facilities violated the Clean Water Act.

### 9. FAILURE TO TREAT IN ACCORDANCE WITH CSO PLAN

■ The Permits required Atlanta to design the CSO treatment facilities so that they would adequately treat the waste whenever rain fell at .25 inch/hour or less. The CSO facility design plan provided *inter alia* that the CSO discharge would be treated during design storm events to "[r]educe fecal coliform counts in the discharge from the CSO to 200/100 ml average and 400/100 ml maximum." The undisputed evidence shows that fecal coliform bacteria levels in the CSO facility discharge exceeded these levels during six out of ten design storm events at the North Avenue CSO facility, seven out of thirteen design storm events at the Greensferry CSO facility, and eight out of sixteen design storm

events at the Tanyard Creek CSO facility. Thus, fecal coliform levels exceeded the maximum level on at least half of the monitored design storm overflow events, frequently by magnitudes of many thousands of times. Therefore, the undisputed facts demonstrate a violation of the Permits and the Clean Water Act with respect to failure to treat in accordance with the CSO plan. The Plaintiffs are entitled to summary judgment as to this claim.

## 10. VIOLATION OF WATER QUALITY STANDARDS

The Permits prohibit Atlanta from violating Georgia Water Quality Standards with the discharge from the CSO treatment facilities from a rainfall event of .25 inches of rainfall per hour or less. The Plaintiffs contend that Atlanta has violated water quality standards in two locations at each CSO facility. The Plaintiffs contend that the treated water in the culvert that runs from each CSO treatment facility to the natural receiving stream does not meet water quality standards. This position is consistent with that of the EPD that "the CSO discharge in effect is part of the stream as it's flowing through the conveyance." (Dep. Alan Hallum, pp. 16–17). The Plaintiffs also contend that the discharge from each of the CSO treatment facilities pollutes the water of the natural receiving stream so that it also violates water quality standards.

The evidence is undisputed and overwhelming that the discharges in the culverts from the CSO treatment facilities do not meet Georgia Water Quality Standards. For example, the design plan for the CSO treatment facilities provided that the facilities would treat the CSO discharge to reduce the level of fecal coliform bacteria to 400/100 ml. This would meet Georgia Water Quality Standards. The undisputed evidence is that the discharge from the CSO treatment facilities exceeds this level regularly during design storm events by massive amounts. For example, during design storm events, the discharge in the culverts of the North Avenue CSO treatment facility had the following levels of fecal coliform bacteria:

| Date | Level |
| --- | --- |
| February 10, 1995 | 560,000/100 ml |
| February 17, 1995 | 230,000/100 ml |
| April 11, 1995 | 47,000/100 ml |
| January 11, 1996 | 80,000/100 ml |
| February 28, 1996 | 53,000/100 ml |
| March 25, 1996 | 520,000/100 ml |

During design storm events, the discharge in the culverts of the Greensferry CSO treatment facility had the following levels of fecal coliform bacteria:

| Date | Level |
| --- | --- |
| January 14, 1995 | 2,000,000/100 ml |
| January 19, 1995 | 163,636/100 ml |
| February 10, 1995 | 60,000/100 ml |
| April 11, 1995 | 400,000/100 ml |
| January 11, 1996 | 54,545/100 ml |
| February 28, 1996 | 34,500/100 ml |
| March 25, 1996 | 240,000/100 ml |

During design storm events, the discharge in the culverts of the Tanyard Creek CSO treatment facility had the following levels of fecal coliform bacteria:

| Date | Level |
| --- | --- |
| January 14, 1995 | 340,000/100 ml |
| January 19, 1995 | 70,000/100 ml |
| February 17, 1995 | 1,000,000/100 ml |
| April 11, 1995 | 320,000/100 ml |
| February 28, 1996 | 50,000/100 ml |
| March 25, 1996 | 63,636/100 ml |
| April 29, 1996 | 16,364/100 ml |

Thus, the undisputed evidence is that the discharges regularly contain levels of fecal coliform bacteria that are many thousands of times greater than that allowed.

The evidence is also undisputed that the discharge in the culverts from the CSO treatment facilities also violates Georgia Water Quality Standards with respect to metals such as cadmium, copper, lead and zinc. This should come as no surprise in that Atlanta did not design the CSO treatment facilities to treat the combined sewage-storm water for these metals. The combined sewer overflow discharge would have been treated for metals if Atlanta had carried out its initial plan. This plan involved building a tunnel to the Utoy Creek Waste Water Treatment Plant. Once the tunnel was built, the combined sewer overflow discharge would be stored in the tunnel until it could be treated at the Utoy Creek Waste Water Treatment Plant. Atlanta canceled the tunnel project in response to political pressure. Because of this decision, Atlanta has spent millions of

dollars to build CSO treatment facilities that are incapable of treating the combined sewer overflows to produce a discharge that meets Georgia Water Quality Standards.

■ Atlanta contends that the discharge in the culverts from the CSO treatment facilities does not have to meet Georgia Water Quality Standards. These water quality standards apply to all "waters of the state" which O.C.G.A. § 12–5–22(13) defines as "any and all rivers, streams, creeks, branches, lakes, reservoirs, ponds, drainage systems, springs, wells, wetlands, and all other bodies of surface or subsurface water, natural or artificial, lying within or forming a part of the boundaries of the State which are not entirely confined and retained completely upon the property of a single individual, partnership, or corporation." The culverts are certainly a drainage system. This definition is broad enough to encompass the discharge in the culverts from the CSO treatment facilities.

In *U.S. v. Eidson*, 108 F.3d 1336 (11th Cir.1997), the Court of Appeals for the Eleventh Circuit considered whether water flowing through a drainage ditch, a storm sewer and a canal were waters of the United States so as to subject them to the requirements of the Clean Water Act. The court observed that pollutants are equally harmful to water quality whether they travel along manmade or natural routes. *Id.* at 1342. The fact that the flow in the waterway is intermittent is not controlling. "Pollutants need not reach interstate bodies of water immediately or continuously in order to inflict serious environmental damage." *Id.* Accordingly, the court held that the drainage ditch into which the pollutants were discharged did constitute "waters of the United States." While *Eidson* dealt with "waters of the United States" under the Clean Water Act, rather than "waters of the state" under the Georgia Water Quality Control Act, this Court finds the *Eidson* court's logic compelling.

The CSO treatment facility culverts drain directly into tributaries of the Chattahoochee River. Discharge of pollutants into the culverts inflicts serious environmental damage. The Court finds as a matter of undisputed fact that the CSO treatment facilities are dumping massive amounts of proscribed metals and fecal coliform bacteria into tributaries of the Chattahoochee River in violation of the Permits. This violates the Clean Water Act. Adopting the restrictive definition of "waters of the state" argued for by Atlanta would grant it a license to pollute.

Atlanta correctly argues that demonstrating which of several sources of pollution is the one that causes a stream to exceed water quality standards is very difficult with respect to metals and some other pollutants. Adopting Atlanta's restrictive interpretation of "waters of the state" would give it virtual immunity from suit for polluting the tributaries of the Chattahoochee River because it could always claim that the stream was already polluted. This Court declines to confer such immunity upon it. The undisputed evidence is that the discharges in the culverts of the CSO treatment facilities violate Georgia Water Quality Standards. Accordingly, Atlanta is violating the Permits and the Clean Water Act and the Plaintiffs are entitled to summary judgment as to this claim.

The Plaintiffs also contend that discharges from the CSO treatment facilities caused the water in the natural receiving streams to violate water quality standards. It is undisputed that grab samples taken downstream of the point where the treated waste from each of the CSO treatment facilities enters the streams show that the water in the streams does not comply with water quality standards. However, the Permits state that Atlanta must not *cause* violations of water quality standards. The Permits do not proscribe worsening of violations, they only prohibit causing violations.

■ With respect to metals, the data from the upstream and downstream samples does not establish whether the receiving stream was already polluted or whether another source of pollution is the reason that the stream does not satisfy the water quality standards. To the contrary, some of the data shows that other sources must be polluting the streams. For example, on June 26, 1996, the water upstream of the Greensferry CSO facility had no copper in it. The facility

discharge contained copper in a concentration of 10.0 ug/L. However, the downstream sample had copper in a concentration of 26.0 ug/L. It seems impossible that the facility could discharge copper into the stream at one level and result in twice that level of copper being present in the stream below. Therefore, there has been no showing as a matter of law of a violation of the Permits based upon upstream and downstream sampling for metals.

■ With respect to fecal coliform bacteria, the Court concludes that the Plaintiffs have shown that the CSO treatment facilities are causing violations of Georgia Water Quality Standards. The CSO treatment facilities are discharging millions of gallons of inadequately treated sewage into the receiving streams. These discharges correlate generally (although not perfectly) with measurements of fecal coliform bacteria in the receiving streams that are thousands of times higher than they should be. Atlanta has argued that there are other sources of fecal coliform bacteria such as general urban runoff. However, it has not shown any other source that is contributing such massive amounts of fecal coliform bacteria to explain the level of fecal coliform bacteria in the receiving streams below the CSO treatment facilities. Atlanta is dumping millions of gallons of inadequately treated sewage into tributaries of the Chattahoochee River. To say that it is not causing violations of water quality standards with respect to fecal coliform bacteria would be to ignore reality. The presence of other sources of fecal coliform pollution does not create a genuine issue of fact as to whether the CSO facilities are causing violations of Georgia Water Quality Standards with respect to the receiving streams below the CSO facilities. Accordingly, Plaintiffs are entitled to summary judgment as to this claim.

### III. SUMMARY

The submitted Motions for Leave to File Briefs in Excess of the Page Limits, for Leave to File Supplemental Briefs and for Leave to Supplement the Record [Doc. Nos. 108, 113, 115, 116 and 119] are **GRANTED.**

The Defendant's Motion for Partial Summary Judgment [64–1] is **GRANTED IN PART AND DENIED IN PART.** It is **GRANTED** as to Plaintiffs' claims for trespass and nuisance in Counts III and IV of the Complaint and as to the standing of the City of West Point, City of LaGrange, City of Hogansville, Troup County, Heard County, Harris County, the Lake Harding Association and the LaGrange–Troup County Chamber of Commerce with respect to the Clean Water Act claims in Count II of the Complaint. It is **DENIED** as to the Clean Water Act claims of the remaining Plaintiffs.

With respect to Count II of the Complaint as to the remaining Plaintiffs, the undisputed facts demonstrate that the City of Atlanta is violating the National Pollutant Discharge Elimination System Permits and the Clean Water Act with respect to the subject CSOs by failing to maintain accurate records, by failing to conduct first flush sampling, by failing to conduct composite sampling, by failing to treat each CSO treatment facility's discharge in accordance with the CSO plan, by violating Georgia Water Quality Standards with respect to the discharges from the CSO treatment facilities, and by violating Georgia Water Quality Standards with respect to fecal coliform bacteria in the receiving streams below the CSO facilities. Therefore, the Motion for Summary Judgment of Plaintiffs Upper Chattahoochee Riverkeeper Fund, Inc. and the Chattahoochee Riverkeeper, Inc. and Robert Hancock [69–1] as to liability with respect to those Clean Water Act claims is **GRANTED.** The Motion for Summary Judgment as to all other Clean Water Act claims is **DENIED.**

Counsel for the Plaintiffs and the Defendant are directed to appear for a conference with the undersigned on November 26, 1997 at 9:30 a.m. to discuss further proceedings in this case, including the relief sought by the Plaintiffs and the form and substance of any temporary or permanent injunctive remedies.